# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SHERMAINE WALKER, individually
and as administrator of the estate of
Marques Davis, deceased, et al.,

        Plaintiffs,

v.

CORIZON HEALTH, INC., formerly
known as Correctional Medical
Services, et al.,

        Defendants.

Case No. 17-2601-DDC-KGG

## MEMORANDUM AND ORDER

On April 13, 2017, inmate Marques Davis died while he was in the custody of the Kansas

Department of Corrections and housed at the Hutchinson Correctional Facility in Hutchinson,

Kansas. Plaintiffs Shermaine Walker (as administrator of Mr. Davis's estate) and I.D.F. (as a

minor and heir at law of Mr. Davis) bring this lawsuit against various entities and individuals

who, plaintiffs allege, denied Mr. Davis access to adequate and competent medical care to

evaluate and treat a serious medical condition. Plaintiffs assert that defendants' disregard for Mr.

Davis's serious medical condition caused him to endure an untreated and progressively

debilitating neurological condition for nearly eight months before dying a horrible and

preventable death.

This matter comes before the court on a motion by just one of the defendants. On June

29, 2018, defendant Sohaib Mohiuddin, M.D., filed a Motion to Dismiss. Doc. 41. Dr.

Mohiuddin's motion asks the court to dismiss plaintiffs' claims against him under Federal Rule

of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim.

On July 20, 2018, the parties filed a Joint Motion asking the court to permit Dr. Mohiuddin to file an Amended/Supplemental Suggestions in Support of his Motion to Dismiss and to extend plaintiffs' time for responding to the motion. Doc. 47. The court granted the parties' request in part. Doc. 48. Specifically, the court granted Dr. Mohiuddin's request to file an Amended/Supplemental Suggestions in Support of his previously filed Motion to Dismiss but denied the motion to the extent he was seeking to file a supplement that—when combined with his Memorandum in Support of his original Motion to Dismiss—would exceed the page limitations established by D. Kan. Rule 7.1(e). Rule 7.1(e) provides that "[t]he arguments and authorities section of briefs or memoranda must not exceed 30 pages absent a court order."

On July 30, 2018, Dr. Mohiuddin filed another Memorandum in Support of his Motion to Dismiss. Doc. 49. Plaintiffs then filed a Response and Suggestions in Opposition to the Motion to Dismiss. Doc. 56. And Dr. Mohiuddin submitted a Reply. Doc. 59.

Dr. Mohiuddin's original Motion to Dismiss includes 24 pages of Arguments and Authorities. Doc. 42 at 3–26. His Amended/Supplemental Suggestions in Support of his Motion to Dismiss consists of 26 pages of Arguments and Authorities. Doc. 49 at 4–29. On closer inspection, the court finds many similarities in the two filings. Most of the arguments asserted in the two filings are identical, but they appear in a different order in Dr. Mohiuddin's second filing. Dr. Mohiuddin's chosen method for proceeding with his motion practice is needlessly inefficient, and it has complicated the court's effort to understand his arguments. It has required the court to parse through the two filings to determine if they differ, and, if so, how they differ. And this practice either violated or came close to violating the court's explicit order that Dr.

Mohiuddin could not supplement a brief that—when combined with his original filing—exceeds the page limitations established in the court's local rules. The court even considered striking Dr. Mohiuddin's Motion to Dismiss for violating the court's order. But exercising its discretion, the court declines to do so, preferring to consider the motion on its merits.

The court thus considers the parties' arguments directed at the Motion to Dismiss in the following subsections. And for reasons explained, the court grants Dr. Mohiuddin's Motion to Dismiss in part and denies it in part.

## I.     Factual Background

The following facts come from plaintiffs' Amended Complaint (Doc. 4), and the court must view them in the light most favorable to plaintiffs. *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) ("We accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the [plaintiffs]." (citation and internal quotation marks omitted)).

On March 12, 2010, Mr. Davis was sentenced to serve time in the Kansas penal system. In June 2016, Mr. Davis was transferred to the Hutchison Correctional Facility ("HCF"). Before he arrived at HCF, plaintiff was a healthy 27-year-old man.

When Mr. Davis was housed at HCF, the Kansas Department of Corrections contracted with defendant Corizon Health, Inc. ("Corizon") to provide medical care to HCF inmates. Defendant Sohaib Mohiuddin, M.D., is a licensed medical doctor. During times relevant to this lawsuit, Corizon employed Dr. Mohiuddin to provide medical care to HCF inmates.

In July and August 2016, Mr. Davis began experiencing numbness in his feet, weakness of his right leg, and severe mid-back pain. Mr. Davis reported his symptoms to many Corizon healthcare providers at the HCF medical unit. By September 2016, Mr. Davis's symptoms had

worsened.  During that month, Mr. Davis made about 12 visits to the HCF medical unit complaining about numbness in his feet, weakness in his right leg, severe mid-back pain, and an increasing inability to walk.  He reported to medical staff: "I can barely walk on my right leg." Doc. 4 at 14 (First Am. Compl. ¶ 37).  Mr. Davis's numbness became so severe he fell in his cell block on September 5, 2016.  Afterwards, Mr. Davis began falling repeatedly because of worsening numbness in his lower extremities.  In response to Mr. Davis's symptoms, healthcare providers prescribed Tylenol and ordered a lumbar x-ray.  But also, they documented their belief that Mr. Davis was faking his symptoms.

Mr. Davis continued to experience the same symptoms through October 2016.  During that month, Mr. Davis made eight visits to the HCF medical unit complaining of those symptoms.  On October 25, 2016, healthcare providers recorded that Mr. Davis's limping was now "very visible and that he has some muscle weakness in his right lower extremity."  *Id.* at 15 (First Am. Compl. ¶ 44).  That same day, a Corizon nurse documented that Mr. Davis needed a referral for an MRI.

On October 31, 2016, a Corizon physician noted that Mr. Davis had muscle weakness in his right leg and numbness in both feet.  Also, the physician documented that Mr. Davis's muscle strength and range of motion were impaired and that he "has lost vibration test in right leg . . . Raising the right leg by his muscle strength is impaired to 30 degrees."  *Id.* (First Am. Compl. ¶ 46).

Mr. Davis continued to experience numbness in his feet, weakness of his right leg, severe mid-back pain, and an increasing inability to walk.  In November 2016, Mr. Davis made five visits to the HCF medical unit to complain about his symptoms.  And, in December 2016, Mr. Davis made another eight visits to the HCF medical unit.  On December 15, 2016, Mr. Davis

began complaining about other symptoms in addition to his previous chronic complaints. His new symptoms included pain, numbness, and itching in his arms that radiated down his arms from his elbows to his fingertips. About two weeks later, Mr. Davis visited the HCF medical unit and reported "it feels like something is eating my brain." *Id.* at 16 (First Am. Compl. ¶ 57). Corizon healthcare providers documented that Mr. Davis's inability to walk was getting more severe, he was experiencing dizziness, and he was having hot sweats.

On January 5, 2017, Mr. Davis reported during a visit to the HCF medical unit, "now my hands are going numb." *Id.* at 17 (First Am. Compl. ¶ 62). In response to his complaints, healthcare providers continued to provide Tylenol to Mr. Davis. On January 19, 2017, Mr. Davis passed out while trying to use the phone. He was placed in the infirmary for observation of his symptoms which included fainting, weakness, tingling and numbness in the extremities, and difficulty walking. Healthcare providers prescribed Mr. Davis prednisone for 10 days but didn't document any diagnosis.

Mr. Davis remained in the infirmary under observation. On February 5, 2017, healthcare providers documented that they were going to pursue a neurology consult for Mr. Davis. He never received the consult. During Mr. Davis's infirmary stay, he continued to ask healthcare providers what was wrong with his body. Mr. Davis's medical records include no response to his questions. Instead, many healthcare providers documented, once again, their belief that Mr. Davis was faking his illness. And the only treatment they provided Mr. Davis was Tylenol, prednisone, and constipation medicine. On February 14, 2017, Mr. Davis was released from the infirmary.

On February 21, 2017, Mr. Davis returned to the medical unit for a follow-up visit. During this visit, Mr. Davis complained about numbness in his feet, weakness of his right leg,

severe mid-back pain, an increasing inability to walk, numbness in his hands, dizziness, and persistent headaches.  Healthcare providers documented that they weren't approving a neurology consult.  Also, they documented that an EKG performed during the visit was abnormal.  They did not memorialize any other action.

On February 23, 2017, a corrections officer brought Mr. Davis to the HCF medical unit. Mr. Davis was having vision problems along with his previous symptoms.  During this visit, healthcare providers documented that Mr. Davis was "dizzy and unsteady on his feet."  *Id.* at 18 (First Am. Compl. ¶ 72).  Also, healthcare providers documented that Mr. Davis was having trouble tracking with his eyes, sluggish pupillary reaction, and erratic eye movement.  On February 27, 2017, Mr. Davis again reported to the infirmary.  He complained primarily about dizziness.  He was discharged 23 hours later.

During March 2017, Mr. Davis's condition declined even more.  He continued to suffer from numbness in his feet, weakness of his right leg, severe mid-back pain, an increasing inability to walk, numbness in his hands, dizziness, vision problems, and migraines.  Yet many healthcare providers continued to document that Mr. Davis was faking his symptoms

On March 25, 2017, Mr. Davis made an emergency visit to the HCF medical unit.  A nurse documented that Mr. Davis "also reports dizziness, balance disturbances, and decreased vision to right eye.  Fingers to hands are stiff and bent in abnormal directions.  Arms shake uncontrollably."  *Id.* at 19 (First Am. Compl. ¶ 76).  Medical staff released him from the infirmary that same day.

A few hours later, Mr. Davis was found lying on the floor outside his cell.  He again was taken to the medical unit.  Healthcare providers documented that Mr. Davis was complaining of dizziness and noted visible trembling in both of his arms.  They admitted him to the infirmary

and gave him a dose of Tylenol. Immediately after Mr. Davis's admission to the infirmary, healthcare providers documented that his "whole body is shaking." *Id.* (First Am. Compl. ¶ 77).

The next day, Mr. Davis's condition worsened. Mr. Davis still was suffering from numbness in his feet, weakness of his right leg, severe mid-back pain, an increasing inability to walk, numbness in his hands, dizziness, vision problems, and migraines. Also, Mr. Davis began acting erratically and uncharacteristically. He needed assistance using the toilet and began urinating in cups and his water pitcher. Because of Mr. Davis's bizarre behavior, staff moved him to an isolation cell within the infirmary.

Between March 31, 2017 and April 12, 2017, Mr. Davis showed symptoms of incontinence. Frequently, he urinated and defecated on himself, making no attempt to clean up after himself. He became increasingly confused, and he began slurring his speech, talking incoherently, and drinking his own urine. Mr. Davis had lost a noticeable amount of weight and was eating only small amounts of his meals.

On April 11, 2017, Mr. Davis finally received an MRI. It showed a widespread infection throughout his brain and evidence of tonsillar herniation (swelling of the brain). After learning the results of Mr. Davis's MRI, Corizon healthcare providers—including Dr. Mohiuddin— refused to order Mr. Davis's immediate hospitalization. Instead, Mr. Davis was returned to his isolation cell within the infirmary.

Around 12:25 p.m. on April 12, 2017, Mr. Davis went into cardio-pulmonary arrest. Nearly 17 minutes later, healthcare providers began administering CPR and notified EMS. EMS transported Mr. Davis to Hutchinson Regional Medical Center. There, Mr. Davis was declared brain dead. A brain CT was performed at Hutchinson Regional Medical Center. It confirmed tonsillar herniation. Also, it showed that Mr. Davis had no hope for recovery.

On April 13, 2017, Mr. Davis died after his life support was terminated. An autopsy revealed that Mr. Davis had a case of far advanced Granulomatous Meningoencephalitis, involving his lungs, liver, kidney, and brain.

## II.    Legal Standard

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction and, as such, must have a statutory basis to exercise jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citation omitted). Federal district courts have original jurisdiction over all civil actions arising under the constitution, laws, or treaties of the United States or where there is diversity of citizenship. 28 U.S.C. §§ 1331–32. "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (citation omitted). Since federal courts are courts of limited jurisdiction, the party invoking federal jurisdiction bears the burden to prove it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Generally, a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) takes one of two forms: a facial attack or a factual attack. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). "First, a facial attack on the complaint's allegations [of] subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true." *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)).

"Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* at 1003. "When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the

complaint's factual allegations." *Id.* "A court has wide discretion to allow affidavits, other documents, and [to conduct] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id.* (internal citations omitted); *Los Alamos Study Grp. v. United States Dep't of Energy*, 692 F.3d 1057, 1063–64 (10th Cir. 2012).

### B. Motion to Dismiss for Failure to State a Claim

Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must assume that the factual allegations in the complaint are true. *Id.* (citing *Twombly*, 550 U.S. at 555). But the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Also, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted).

For a complaint to survive a motion to dismiss under Rule 12(b)(6), the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 679 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

## III.    Analysis

Plaintiffs' Complaint[1] asserts six causes of action against 17 defendants. But plaintiffs assert just three claims against Dr. Mohiuddin: (1) violating 42 U.S.C. § 1983 for deliberate indifference to a serious medical need and for failing to provide medical care and treatment (Count IV); (2) a Kansas law claim for negligence/wrongful death (Count V); and (3) a Kansas law claim for negligence/survival (Count VI).

Dr. Mohiuddin makes several arguments supporting his Motion to Dismiss the three claims plaintiffs assert against him. The court addresses each argument, in turn, below.

### A.  Standing

Dr. Mohiuddin asserts that plaintiffs lack standing to assert their claims against him. He bases his standing attack on three arguments. The court considers each argument in the following three subsections.

#### 1.  § 1983 Standing

First, Dr. Mohiuddin asserts that plaintiffs lack standing and the capacity to assert a

---

[1]     For simplicity, this Order refers to plaintiffs' Amended Complaint (Doc. 4) as the Complaint.

§ 1983 claim against him. More specifically, Dr. Mohiuddin argues that plaintiff Shermaine Walker (in her individual capacity) and plaintiff I.D.F. (individually) cannot assert a § 1983 claim on their own behalf based on actions allegedly denying Mr. Davis's constitutional rights.

Federal Rule of Civil Procedure 17 governs a party's capacity to sue and be sued. Rule 17(a) requires that all actions "be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). When determining the real party in interest for a § 1983 claim, the court looks to governing substantive law. *Payne v. McKune*, No. 06-3010-JWL, 2007 WL 1019193, at *1 (D. Kan. Apr. 4, 2007) (citing *Esposito v. United States*, 368 F.3d 1271, 1273 (10th Cir. 2004)).

The Tenth Circuit has explained it is a "well-settled principle that a section 1983 claim must be based on the violation of plaintiff's personal rights, and not the rights of someone else." *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990). So, in § 1983 death cases, the Tenth Circuit has held that the proper federal remedy is "a survival action, brought by the estate of the victim, in accord with § 1983's express statement that the liability is 'to the party injured.'" *Berry v. City of Muskogee*, 900 F.2d 1489, 1506–07 (10th Cir. 1990). Rule 17(b) provides that, when the party bringing suit acts in a representative capacity, the court must determine the party's capacity to sue under Kansas law. Fed. R. Civ. P. 17(b)(3).

Kansas law requires that a survival action "must be maintained by the personal representative of the decedent, and cannot be brought by the decedent's heirs." *Payne*, 2007 WL 1019193, at *2 (first citing *Cory v. Troth*, 223 P.2d 1008, 1010–11 (Kan. 1950); then citing *Howe v. Mohl*, 214 P.2d 298, 301 (Kan. 1950)); *see also Estate of Smart v. City of Wichita*, No. 14-2111-EFM, 2018 WL 534335, at *2 (D. Kan. Jan. 24, 2018) ("Under Kansas law, survival claims must be maintained by an administrator of the decedent's estate, and cannot be brought by the decedent's heirs." (citations omitted)).

Plaintiffs concede that Shermaine Walker—in her individual capacity—lacks standing to bring a § 1983 claim on behalf of Mr. Davis. Doc. 56 at 27. But plaintiffs assert that Ms. Walker properly brings the § 1983 claim against Dr. Mohiuddin in her capacity as the Administrator of Mr. Davis's estate. *Id.* The court agrees with them.

Thus, to the extent the Complaint asserts a § 1983 claim against Dr. Mohiuddin on behalf of plaintiff Shermaine Walker suing in her individual capacity or plaintiff I.D.F. as Mr. Davis's heir, the court dismisses those claims. Those plaintiffs, acting in those modes of capacity, lack standing to sue under § 1983. *See, e.g.*, *Estate of Smart*, 2018 WL 534335, at *4 (permitting plaintiffs to amend their Complaint to "mak[e] clear they are prosecuting [decedent's] survival claims as administrators of the estate" and not in their individual capacities as decedent's parents); *Naumoff v. Old*, 167 F. Supp. 2d 1250, 1253 (D. Kan. 2001) (holding that a decedent's mother who asserted a § 1983 claim in her individual capacity—not as the representative of her son's estate—had no standing to assert the § 1983 claim); *Estate of Fuentes ex rel. Fuentes v. Thomas*, 107 F. Supp. 2d 1288, 1295–96 (D. Kan. 2000) (holding that decedent's children did not have standing to assert a claim based on an alleged constitutional violation because "the rights of the decedent . . . may be asserted only by the estate of the decedent").

But the court denies Dr. Mohiuddin's Motion to Dismiss the § 1983 claim that plaintiff Shermaine Walker asserts against him in her capacity as the Administrator of Mr. Davis's estate.

### 2. Pleading Both a § 1983 Claim and a Kansas Survival Claim

Second, Dr. Mohiuddin contends that the Complaint cannot assert both a § 1983 claim and a survival claim under Kansas law. Dr. Mohiuddin acknowledges that a plaintiff may assert "state wrongful death actions . . . as pendant state claims" to a § 1983 action. *Berry v. City of*

*Muskogee*, 900 F.2d 1489, 1507 (10th Cir. 1990). But, he contends, "there can be no duplication of recovery" under both theories. *Id.*

Plaintiffs respond to this argument, correctly asserting that Federal Rule of Civil Procedure 8 allows them to plead the two claims as alternative theories. *See* Fed. R. Civ. P. 8(a)(3) (authorizing a party to plead "relief in the alternative or different types of relief"); *see also* Fed. R. Civ. P. 8(d)(2) (allowing a party to "set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."). The court thus denies this portion of Dr. Mohiuddin's Motion to Dismiss. It is not persuasive.

### 3. Standing to Assert a Wrongful Death Claim in Kansas

Finally, Dr. Mohiuddin argues that plaintiff Shermaine Walker—both in her individual capacity and her capacity as Administrator of Mr. Davis's estate—lacks standing to assert Count V's wrongful death claim under Kansas law. Plaintiffs concede that Ms. Walker—individually—has no standing to assert a wrongful death claim in her individual capacity. Doc. 56 at 27. But plaintiffs contend that Ms. Walker may bring the wrongful death claim in her capacity as Administrator of Mr. Davis's estate. *Id.*

Kan. Stat. Ann. § 60-1902 provides that "any one of the heirs at law of the deceased who has sustained a loss by reason of the death" may bring a wrongful death action. "[I]t is well-settled" that a wrongful death claim asserted under § 60-1902 "can only be brought on behalf and for the benefit of the decedent's heirs, *not his estate*." *Estate of Sisk v. Manzanares*, 270 F.

Supp. 2d 1265, 1281 (D. Kan. 2003) (citing Kan. Stat. Ann. § 60-1902) (other citation omitted) (emphasis added); *see also Tank v. Chronister*, 160 F.3d 597, 599 (10th Cir. 1998) ("[A] wrongful death action may be brought only by the decedent's heirs-at-law pursuant to Kan. Stat. Ann. § 60-1902, and only for their 'exclusive benefit' for damages suffered by them as a result of the wrongful death.").

The Kansas "wrongful death statutes use the terms 'heir' and 'heir at law' interchangeably," and they refer to "'one who takes by intestate succession under the Kansas statutes.'" *Johnson v. McArthur*, 596 P.2d 148, 153 (Kan. 1979) (quoting *Jackson v. Lee*, 392 P.2d 92, 95 (Kan. 1964)). In other words, an heir at law is the person "designated by statute who succeeds to the estate of a deceased person." *Id.* at 152 (citation and internal quotation marks omitted).

In Kansas, a decedent's children become heirs at law when the deceased leaves one or more children but not a spouse. Kan. Stat. Ann. § 59-506. Here, the Complaint alleges that plaintiff I.D.F. is Mr. Davis's surviving natural daughter and his heir at law. Doc. 4 at 7 (First Am. Compl. ¶ 9). Thus, plaintiff I.D.F., as Mr. Davis's heir at law, has standing to assert a Kansas wrongful death claim. But plaintiff Shermaine Walker—as Mr. Davis's surviving mother and Administrator of his estate—does not qualify as an heir at law under the Kansas statutes. *See, e.g.*, *Carter v. City of Emporia*, 543 F. Supp. 354, 357 (D. Kan. 1982) (holding that the deceased's mother was not an "heir at law" under the Kansas wrongful death statutes when the deceased was survived by four children and no spouse, and therefore, the deceased's mother was not the proper party to bring the wrongful death action). Thus, plaintiff Shermaine Walker—whether proceeding in her individual capacity or as Administrator of Mr. Davis's estate—lacks standing to assert Count V's wrongful death claim. So, the court dismisses

plaintiff Shermaine Walker's Kansas wrongful death claim asserted in Count V. But plaintiff I.D.F.'s Kansas wrongful death claim survives because, as Mr. Davis's heir at law, she is the proper party to assert the claim.

### B. Failure to State a Claim

The court next turns to Dr. Mohiuddin's argument that plaintiffs' Complaint fails to state a plausible § 1983 claim against him. Count IV asserts a § 1983 claim against Dr. Mohiuddin and other defendants. Doc. 4 at 38–40 (First Am. Compl. ¶¶ 142–49). This claim alleges that Dr. Mohiuddin and others were deliberately indifferent to Mr. Davis's serious medical needs, and thus violated Mr. Davis's right to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution (as applied to the States through the Fourteenth Amendment). *Id.* (First Am. Compl. ¶ 142). Specifically, plaintiffs allege Dr. Mohiuddin and others were deliberately indifferent to Mr. Davis's rights under the Eighth Amendment because they (1) failed to provide him with prompt medical attention to serious medical needs; (2) failed to make timely referrals for offsite specialty medical and diagnostic services; (3) belatedly or untimely authorized offsite specialty medical care and treatment; (4) delayed or failed to respond to his serious medical need; (5) utilized conservative treatment methodologies; (6) failed to transfer him promptly from HCF to a hospital for diagnosis and treatment; (7) seriously aggravated his medical condition by ignoring his medical condition for about eight months; (8) failed to treat his serious medical need; (9) seriously aggravated his medical condition by failing to render meaningful medical care; and (10) failed to respond appropriately to his medical emergency. *Id.* at 39 (First Am. Compl. ¶ 144).

The Supreme Court has recognized "that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth

Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation and internal quotation marks omitted).  To state a cognizable claim for an Eighth Amendment violation, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Id.* at 106.  The "deliberate indifference" test involves "'both an objective and a subjective component.'"  *Requena v. Roberts*, 893 F.3d 1195, 1215 (10th Cir. 2018) (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)).

The objective component requires the plaintiff to allege that the deprivation at issue was sufficiently serious.  *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).  This standard means that the defendant's actions "must result in the denial of the minimal civilized measure of life's necessities."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation and internal quotation marks omitted).  A medical or dental need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Ramos*, 639 F.2d at 575.

The subjective prong of the standard requires the prisoner to allege that the official was deliberately indifferent to a serious medical need.  *Farmer*, 511 U.S. at 834.  This requires the prison official to have a culpable mental state.  *Id.*  A plaintiff sufficiently alleges a culpable mindset when the facts alleged show that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.

Here, Dr. Mohiuddin doesn't explicitly dispute whether the Complaint alleges facts capable of supporting a finding or inference sufficient for the objective prong.  Nevertheless, the court finds the Complaint's allegations sufficient.  The Complaint alleges that, in July and

August 2016, Mr. Davis began experiencing numbness in his feet, weakness of his right leg, and severe mid-back pain.  The Complaint alleges that these symptoms grew worse in the coming months and impaired Mr. Davis's ability to walk.  Later, Mr. Davis began to experience pain, numbness, itching in his arms, dizziness, hot sweats, fainting, persistent headaches, vision problems, and continued difficulty with walking.  By March 2017, Mr. Davis began acting erratically and uncharacteristically.  For example, he began urinating and defecating on himself.  Also, he was eating only small amounts of food and had lost a noticeable amount of weight.  In April 2017, an MRI revealed that Mr. Davis had a widespread infection throughout his brain and evidence of tonsillar herniation (a swelling of the brain).  The day after the MRI, Mr. Davis went into cardio-pulmonary arrest, was transported to the hospital, and was declared brain dead.  An autopsy later revealed that Mr. Davis had a case of far advanced Granulomatous Meningoencephalitis, involving his lungs, liver, kidney, and brain.  If plaintiffs can support these allegations with admissible evidence, they could support a jury finding that would satisfy the objective prong of the deliberate indifference test.

Also, the court finds that the Complaint's allegations satisfy the subjective prong of this test.  The subjective prong requires plaintiffs to plead facts capable of supporting a plausible finding or inference that Dr. Mohiuddin disregarded a substantial risk of serious harm.  At the pleading stage, the court must evaluate the Complaint's sufficiency by assuming the well-pleaded factual allegations are true and then draw all reasonable inferences in plaintiffs' favor.  In light of the serious medical need alleged, the court finds the allegations here will suffice to support a plausible inference that Dr. Mohiuddin—as a licensed physician assigned to provide medical care to HCF inmates—either observed Mr. Davis's symptoms and behavior or was made aware of those symptoms and his condition, but still failed to ensure proper medical treatment.

Indeed, the Complaint specifically alleges that Dr. Mohiuddin was deliberately indifferent to Mr. Davis's Eighth Amendment rights because he failed and refused to order Mr. Davis's immediate hospitalization after his abnormal MRI on April 11, 2017, even though Mr. Davis had a life threatening and serious medical need. Doc. 4 at 39 (First Am. Compl. ¶ 145). These allegations could support a plausible finding or inference that Dr. Mohiuddin had the requisite state of mind to satisfy the subjective component of the deliberate indifference test.

The court thus concludes that the Complaint sufficiently pleads a plausible § 1983 claim for deliberate indifference in violation of the Eighth and Fourteenth Amendments. The court denies this portion of Dr. Mohiuddin's Motion to Dismiss.

### C. Qualified Immunity

Next, Dr. Mohiuddin argues that the doctrine of qualified immunity bars plaintiffs from suing on the claims asserted against him. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

To allege a § 1983 claim against an individual defendant that will survive a qualified immunity defense, plaintiff must allege facts that "make out a violation of a constitutional right," and demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A court

has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

Plaintiffs assert that Dr. Mohiuddin is precluded from asserting the qualified immunity defense because this doctrine only shields officials from liability for discretionary acts. *See Elwell v. Byers*, 699 F.3d 1208, 1212 n.3 (10th Cir. 2012) ("Qualified immunity only extends to 'government officials performing discretionary functions.'" (quoting *Harlow*, 457 U.S. at 818)). The Tenth Circuit has recognized that "the discretionary-function question is quite obvious in many cases," and so "it is frequently omitted from the qualified immunity analysis." *Id.*

Here, plaintiffs contend, Dr. Mohiuddin's obligation to provide a constitutionally adequate level of medical care is a mandatory function of his governmental job—not a discretionary one. For support, plaintiffs rely on cases holding merely that the Eighth Amendment prohibits prison officials from acting in a deliberately indifferent manner to a prison inmate's serious medical needs. Doc. 56 at 21 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (other citations omitted)). But plaintiffs provide the court with no authority holding that a prison medical provider performs a mandatory function when providing—or not providing—medical care to prison inmates. To the contrary, several courts have concluded that the decision whether to provide medical care to prisoners is a discretionary function. *See, e.g.*, *Medley v. Shelby Cty.*, 742 F. App'x 958, 961–62 (6th Cir. 2018) (concluding that detention center deputies were exercising discretionary functions when they failed to recognize the severity of an inmate's burns, refused to second-guess the medical staff's decision, and didn't call an ambulance); *Nam Dang ex rel. Vina Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1279 (11th Cir. 2017) (holding that healthcare providers acted within the course and scope of their discretionary authority when providing medical care to a detainee); *Sama v. Hannigan*, 669 F.3d 585, 591 (5th

Cir. 2012) (explaining that "[q]ualified immunity generally shields government officials performing discretionary functions, *such as the administration of medical care*, from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (citations and internal quotation marks omitted) (emphasis added)); *Cooper v. Rogers*, 968 F. Supp. 2d 1121, 1130 (M.D. Ala. 2013) ("It has long been held that the decision to bestow or deny medical services to prisoners, such as Plaintiff, is a discretionary function for purposes of qualified immunity analysis."); *Abu-Fakher v. Brodie*, No. 04-3168-JAR, 2005 WL 627980, at *5–6 (D. Kan. Mar. 4, 2005) (holding that qualified immunity shielded two defendants "in the exercise of their discretionary functions" from plaintiff's allegations that they had failed to provide plaintiff with proper medical care).[2]  The court thus rejects plaintiffs' argument that Dr. Mohiuddin—as a licensed medical doctor assigned to provide care to HCF inmates—cannot assert a qualified immunity defense.

But the court finds that plaintiffs have sustained their burden to overcome Dr. Mohiuddin's qualified immunity defense at the motion to dismiss stage.  As discussed above, the Complaint alleges facts sufficient to allege a plausible claim against Dr. Mohiuddin for violating Mr. Davis's Eighth and Fourteenth Amendment rights.  Thus, the Complaint alleges facts that suffice to overcome the first prong of the qualified immunity analysis—*i.e.*, facts that "make out a violation of a constitutional right."  *Pearson*, 555 U.S. at 232.  The court also concludes that plaintiffs have satisfied their burden—at the pleading stage—to demonstrate that the constitutional right at issue was "clearly established" under the second prong of the qualified

---

[2]     The court has found no Tenth Circuit authority addressing whether a government official exercises discretionary authority when administering medical care.  But the court predicts that the Tenth Circuit would follow the reasoning of the decisions cited in this section and, like them, also hold that providing—or not providing—medical care to prison inmates is a discretionary function.

immunity test.  It was clearly established law that a government official cannot act with deliberate indifference to a prisoner's serious medical needs.  *Estelle*, 429 U.S. at 104.  Here, Dr. Mohiuddin argues that the alleged facts fail to establish that his conduct was deliberately indifferent to Mr. Davis's medical needs.  But, on a motion to dismiss, the court must accept the Complaint's allegations as true and view them in plaintiffs' favor.  Under this standard, the Complaint's allegations—specifically the severity of Mr. Davis's symptoms and Dr. Mohiuddin's failure to provide adequate medical care in response to those symptoms—are sufficient to state a plausible claim that Dr. Mohiuddin violated clearly established law by depriving Mr. Davis of a constitutional right.

### D.  Eleventh Amendment Immunity

Dr. Mohiuddin next argues that Eleventh Amendment immunity bars the claims that the Complaint asserts against him in his official capacity.  *See* Doc. 4 at 10 (First Am. Compl. ¶ 17) (reciting that "Plaintiffs bring suit against Defendant Mohiuddin in his individual and official capacities.").  The Eleventh Amendment generally bars suits against states and their agencies based on their sovereign immunity.  *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001))).  Also, the Eleventh Amendment bars federal court jurisdiction over a state official acting in his official capacity in a suit for damages. *See Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1196 & n.13 (10th Cir. 1998) (explaining that the Eleventh Amendment barred plaintiffs' §§ 1981, 1983, and 1985 claims for money damages against state officials in their official capacities); *see also Neal v. Lewis*, 325 F. Supp. 2d 1231, 1235 (D. Kan. 2004) (holding that "state officials acting in their official capacity" are

"entitled to absolute immunity [from § 1983 claims] for acts performed in their official capacity" because they are "not persons within the meaning of 42 U.S.C. § 1983" (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66–71 (1989))).

Here, the Complaint asserts that Dr. Mohiuddin—as a physician employed by Corizon to provide medical care to HCF inmates—was "acting under color of state law" "[a]t all material times."  Doc. 4 at 10 (First Am. Compl. ¶ 17).  Thus, Dr. Mohiuddin argues, he is entitled to Eleventh Amendment immunity—as a state agent—for the claims asserted against him in his official capacity.  *See, e.g.*, *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) ("It has long been settled that the [Eleventh Amendment's] reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities."); *Clark v. Stovall*, 158 F. Supp. 2d 1215, 1225 (D. Kan. 2001) (holding that Eleventh Amendment immunity extended to an entity "[s]ued exclusively in its capacity as an . . .  agent acting under color of state law"). Plaintiffs never respond to Dr. Mohiuddin's Eleventh Amendment argument.  *See generally* Doc. 56.  And thus, plaintiffs have conceded that the Eleventh Amendment bars their official capacity claims against Dr. Mohiuddin.  Given plaintiffs' implicit concession on this point and the authorities cited in the Order, the court dismisses the official capacity claims asserted against Dr. Mohiuddin.

### E.  Liability Among Health Care Providers

Dr. Mohiuddin next argues that Kan. Stat. Ann. § 40-3403(h) bars plaintiffs' Kansas state law claims for wrongful death (Count V) and survival (Count VI) because the statute precludes liability based on any injury caused by services provided by another healthcare provider.  Kan. Stat. Ann. § 40-3403(h) provides:

A health care provider who is qualified for coverage under the [health care stabilization] fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund.

Kan. Stat. Ann. § 40-3403(h); *see also Cady v. Schroll*, 317 P.3d 90, 100 (Kan. 2014) ("[W]e reaffirm the holding in those cases that [Kan. Stat. Ann. §] 40-3403(h) absolves a health care provider not just from vicarious liability but from any responsibility, including independent liability, where the injured party's damages are derivative of and dependent upon the rendering of or the failure to render professional services by another health care provider."); *Luttrell v. Brannon*, No. 17-2137-JWL, 2018 WL 3032993, at *10–11 (D. Kan. June 19, 2018) (holding that Kan. Stat. Ann. § 40-3403(h) immunizes healthcare providers from liability for plaintiff's state law claims that "arise out of another health care provider's rendering of or failure to render professional services").

Here, Dr. Mohiuddin's argument misses the mark for at least two reasons. First, on a motion to dismiss, the court can't simply assume that Dr. Mohiuddin met the requirements for coverage under the health care stabilization fund at the times material to the allegations, and as defined by Kan. Stat. Ann. §§ 40-3401, *et seq.* The Complaint makes no allegations of this nature, and Dr. Mohiuddin never cites any authority permitting the court to go beyond the Complaint on this issue. So, the court cannot conclude whether Kan. Stat. Ann. § 40-3403(h) applies to the alleged facts here as a matter of law.

Second, even if the Complaint's allegations established that Dr. Mohiuddin is covered by Kan. Stat. Ann. § 40-3403(h), that statute doesn't immunize Dr. Mohiuddin from liability because the Complaint plausibly pleads the Kansas wrongful death and survival claims against Dr. Mohiuddin based on his *own* acts and failure to act—it does not rely exclusively on acts of

other healthcare providers.  Indeed, plaintiffs' Response to Dr. Mohiuddin's motion specifically asserts that the Complaint doesn't allege any claims based on respondeat superior or vicarious liability theories.  Doc. 56 at 3, 15.  Instead, plaintiffs argue, the Complaint asserts the Kansas claims against Dr. Mohiuddin based on his own negligent conduct.  *Id.* at 25.  The court agrees. One plausibly can infer from the Complaint's allegations that plaintiffs seek to hold Dr. Mohiuddin liable for his own acts and omissions when he provided (or failed to provide) medical care to Mr. Davis.  *See, e.g.*, Doc. 4 at 42 (First Am. Compl. ¶ 153) ("After Decedent Marques Davis' abnormal April 11, 2017 MRI, Defendants Paul Corbier, M.D., Sohaib Mohiuddin, M.D., and Karl Saffo, M.D. were negligent in that said defendants failed and refused to order immediate hospitalization in light of a life threatening, serious medical need."); *id.* at 41–43 (First Am. Compl. ¶¶ 151–56, 158).  Construing these allegations in plaintiffs' favor, Kan. Stat. Ann. § 40-3403(h) does not apply to bar plaintiffs' Kansas wrongful death and survival claims. *See Nash v. Blatchford*, __ P.3d __, 2019 WL 102254, at *10 (Kan. Ct. App. Jan. 4, 2019) (holding that Kan. Stat. Ann. § 40-3403 did not immunize defendant because the case did "not involve another health care provider's potential vicarious liability for [defendant's] alleged negligence" but, instead, plaintiff had "sued [defendant] for his acts or omissions while performing surgery or when providing [plaintiff's] care and treatment," and the statute "does not prohibit a claim against one health care provider for his or her negligent acts").

### F.  Punitive Damages

Finally, Dr. Mohiuddin argues that the Complaint fails to state a plausible claim for punitive damages under either federal or Kansas law.  Plaintiffs' Complaint only asserts a federal punitive damages claim against Dr. Mohiuddin with Count IV's § 1983 claim.  Doc. 4 at 40 (First Am. Compl. ¶ 148); *see also* Doc. 56 at 19 (explaining that the "Complaint only contains

one claim for punitive damages against Defendant Mohiuddin, specifically under 42 U.S.C. § 1983 in Count IV"). Thus, the court considers simply whether plaintiffs' Complaint pleads a plausible claim for punitive damages under § 1983.

A plaintiff may recover "'punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Eisenhour v. Weber Cty.*, 897 F.3d 1272, 1280–81 (10th Cir. 2018) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Dr. Mohiuddin argues that the Complaint fails to allege facts showing that he acted with an evil motive or intent or reckless or callous indifference to Mr. Davis's constitutional rights. The court disagrees. Taking the allegations as true and construing them in plaintiffs' favor, as the court must on a Rule 12(b)(6) motion to dismiss, the Complaint alleges that Mr. Davis exhibited symptoms manifesting a serious medical need. Also, the Complaint alleges that Dr. Mohiuddin—one of the licensed physicians assigned to provide medical care to HCF inmates— failed to provide Mr. Davis proper medical care to treat Mr. Davis's symptoms. At the pleading stage, these facts suffice to support a finding or inference that Dr. Mohiuddin acted with at least reckless or callous indifference to Mr. Davis's constitutional rights. The court thus denies Dr. Mohiuddin's Motion to Dismiss plaintiffs' § 1983 punitive damages claim asserted in Count IV.

## IV. Conclusion

The court grants Dr. Mohiuddin's Motion to Dismiss in part and denies it in part. Specifically, the court grants Dr. Mohiuddin's Motion to Dismiss the following claims:

- Plaintiffs' § 1983 claim against Dr. Mohiuddin (Count IV) to the extent plaintiff Shermaine Walker and plaintiff I.D.F. assert the claim against him in their

individual capacities because only plaintiff Shermaine Walker—in her capacity as the Administrator of Mr. Davis's estate—has standing to assert this claim.

- Plaintiff Shermaine Walker's wrongful death claim against Dr. Mohiuddin (Count V)—asserted either in her individual capacity or in her capacity as Administrator of Mr. Davis's estate—because only plaintiff I.D.F. has standing to assert this claim as Mr. Davis's heir at law.

- The official capacity claims asserted against Dr. Mohiuddin.

The court denies Dr. Mohiuddin's Motion to Dismiss in all other respects.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Sohaib Mohiuddin, M.D.'s Motion to Dismiss (Doc. 41) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 28th day of February, 2019, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
