### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**SHERMAINE WALKER, individually and as administrator of the estate of Marques Davis, deceased, et al.,**

        **Plaintiffs,**

**v.**

**CORIZON HEALTH, INC., formerly known as Correctional Medical Services, et al.,**

        **Defendants.**

**Case No. 17-2601-DDC-KGG**

<u>**MEMORANDUM AND ORDER**</u>

On April 13, 2017, inmate Marques Davis died while he was in the custody of the Kansas Department of Corrections and housed at the Hutchinson Correctional Facility in Hutchinson, Kansas. Plaintiffs Shermaine Walker (as administrator of Mr. Davis's estate) and I.D.F. (as a minor and heir at law of Mr. Davis) filed this lawsuit against various entities and individuals who, plaintiffs allege, denied Mr. Davis access to adequate and competent medical care to evaluate and treat a serious medical condition. After several years of litigation, just two defendants remain in the action: Corizon Health, Inc. ("Corizon")[1] and Dr. Paul Corbier.

---

[1]     Plaintiffs' Second Amended Complaint names this defendant as "Corizon Health, Inc. ('Corizon'), f/k/a Correctional Medical Services ('CMS') and alternately known as Corizon, L.L.C." Doc. 148-2 at 5 (Second Am. Compl. ¶ 12). Corizon LLC filed an Answer to the Second Amended Complaint asserting that it is "incorrectly named as 'Corizon Health, Inc.'" Doc. 151 at 1. The case's caption still refers to this defendant as "Corizon Health, Inc." And, the Pretrial Order refers to this defendant both as "Corizon, LLC" and "Corizon Health, Inc." *Compare* Doc. 196 at 12 (Pretrial Order ¶ 4.a.1.A.) (asserting claims under 42 U.S.C. § 1983 against "Defendants Corizon, LLC[ ] and Paul Corbier, M.D.") *with id.* at 18 (Pretrial Order ¶ 4.a.2.A.) (asserting "Kansas state law claim for wrongful death against Defendant Corizon Health, Inc."). For simplicity, this Order refers to this defendant as "Corizon."

Both defendants have filed Motions for Summary Judgment (Docs. 186 & 200) against plaintiffs' claims asserted under 42 U.S.C. § 1983 and Kansas common law.  Also, plaintiffs have filed a "Motion for Leave to File Surreply on Defendant Paul Corbier, M.D.'s Motion for Summary Judgment Concerning the Role of 'Reviewing' Physician Margaret Smith, M.D." (Doc. 230).  For reasons explained below, the court grants in part and denies in part both defendants' Motions for Summary Judgment.  The court begins, however, with the Surreply issue.

## I.      Plaintiffs' Motion for Leave to File a Surreply

Plaintiffs have filed a "Motion for Leave to File Surreply on Defendant Paul Corbier, M.D.'s Motion for Summary Judgment Concerning the Role of 'Reviewing' Physician Margaret Smith, M.D." (Doc. 230).  Dr. Corbier's summary judgment motion repeatedly cites a "review" of Mr. Davis's care conducted by an outside independent practitioner and signed by Margaret L. Smith, M.D.  *See* Doc. 187 at 10, 11, 20–22, 26–27, 30.  Dr. Corbier asserts that he received a copy of the review.  Doc. 187-5 at 3 (Corbier Aff. ¶ 8).  And, he attests that the feedback from the review confirmed to him and the Corizon clinicians that "all reasonable diagnostic testing [of Mr. Davis] had been performed, there were no reasonable alternatives that [they] were missing, and that the best course was continued observation over time to see if a diagnosis would present itself."  *Id.* (Corbier Aff. ¶ 9).  Notably, Dr. Smith's one-page report specifically recites that "clinical staff" reviewed the case based on a concern raised by Mr. Davis's mother "that he might have multiple sclerosis."  Doc. 187-6.  And, her report never identifies the information that the "clinical staff" reviewed to reach the conclusions in the report.  *Id.*

Plaintiffs' Motion for Leave to File a Surreply asserts that Dr. Corbier's summary judgment motion "fundamentally misrepresented the role of 'reviewing' physician Margaret

Smith, M.D." Doc. 230 at 1. Plaintiffs assert that they finally deposed Dr. Smith on March 10, 2022, after her deposition was delayed because of COVID-related concerns. *Id.* at 2. Plaintiffs represent that Dr. Smith testified at her March 10 deposition that "she did not perform a care or case review in this matter, that she never at any time reviewed any of Mr. Davis' medical records, and that she has never examined Mr. Davis nor met with or communicated with any of his doctors or medical providers."[2] *Id.* at 1. Also, plaintiffs' proposed Surreply (attached to the motion) asserts that Dr. Smith testified that the review was limited to one concern raised by Mr. Davis's mother, *i.e.*, whether he had multiple sclerosis, and this review was performed by another, unidentified physician, and not Dr. Smith. *Id.* at 11–13. Plaintiffs represent that Dr. Smith's role was limited to reviewing the unidentified physician's assessment and comparing it with the memorandum prepared by the Kansas Department of Corrections about the assessment (Doc. 187-6) to make sure the information in the memorandum was consistent with the physician's assessment. Doc. 2130 at 12–13. Plaintiffs thus seek leave to file a Surreply to Dr. Corbier's summary judgment motion to add Dr. Smith's testimony to the summary judgment record and controvert Dr. Corbier's description of the case review.

Our court's local rules limit briefing on motions to the motion (with memorandum in support), a response, and a reply. D. Kan. Rule 7.1(a) & (c). Surreplies typically are not allowed. *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x 752 (10th Cir. 2006). Instead, surreplies are permitted only with leave of court and under "rare circumstances." *Humphries v. Williams Nat. Gas Co.*, No. 96-4196-SAC, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998) (citations omitted). As an example, when a moving party

---

[2]    Plaintiffs' motion cites and quotes Dr. Smith's deposition testimony and represents that it is attached as Exhibit U. But, plaintiffs haven't filed any attached exhibits with their Motion for Leave to File a Surreply.

raises new material for the first time in a reply, the court should give the nonmoving party an opportunity to respond to that new material (which includes both new evidence and new legal arguments) in a surreply. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003). The rules governing filing of surreplies "are not only fair and reasonable, but they assist the court in defining when briefed matters are finally submitted and in minimizing the battles over which side should have the last word." *Humphries*, 1998 WL 982903, at *1 (citation omitted).

This case doesn't present any of the "rare circumstances" warranting leave to file a surreply. *Humphries*, 1998 WL 982903, at *1. To be sure, the additional facts about Dr. Smith's case review provide more clarity about that review—one that Dr. Corbier extensively relies on in his summary judgment briefing to argue that he wasn't deliberately indifferent to Mr. Davis's serious medical needs. But, even on the current record, and as discussed in more detail below, Dr. Smith's report doesn't insulate Dr. Corbier from liability. A reasonable jury could conclude that Dr. Smith's one-page review was not a sufficient review of Mr. Davis's symptoms because it specifically recites that "clinical staff" conducted the review in response to Mr. Davis's mother's concern about multiple sclerosis and it includes no information about what "clinical staff" reviewed to reach the conclusions asserted in the memorandum. Also, the summary judgment record contains other facts about Mr. Davis's symptoms and Dr. Corbier's response to reports about his symptoms from which a reasonable jury could conclude that Dr. Corbier was deliberately indifferent to Mr. Davis's serious medical needs. Because of this factual issue, the court denies Dr. Corbier's summary judgment motion below. The court doesn't need to consider plaintiffs' proposed Surreply to reach that conclusion. Thus, the court denies plaintiffs' Motion for Leave to File a Surreply (Doc. 230).

## II.     Uncontroverted Facts

The following facts either are stipulated in the Pretrial Order (Doc. 196), uncontroverted, or where genuinely controverted, viewed in the light most favorable to the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

### *The Parties*

At the times relevant to this action, Marques Davis was an inmate in the custody of the Kansas Department of Corrections ("KDOC").  Doc. 196 at 2 (Pretrial Order ¶ 2.a.1.).  During Mr. Davis's incarceration, defendant Corizon contracted with the State of Kansas and KDOC to provide certain healthcare services to inmates in KDOC's custody, including inmates housed at the Hutchinson Correctional Facility.  *Id.* (Pretrial Order ¶ 2.a.3.).  And, during times relevant to this action, defendant Paul Corbier, M.D. was a physician, employed by Correctional Healthcare Associates of Kansas, who served as the Regional Medical Director for Corizon for the State of Kansas.  *Id.* at 3 (Pretrial Order ¶ 2.a.4.); *see also* Doc. 187-5 at 1 (Corbier Aff. ¶ 1).

In his role as Regional Medical Director, Dr. Corbier did not provide care directly to patients.  Doc. 187-5 at 1 (Corbier Aff. ¶ 2).  He worked at Corizon's office in Topeka, Kansas.  Doc. 209-19 at 9–10 (Corbier Dep. 9:19–10:15).  Inmates generally received direct medical care from on-site staff at the prison.  Doc. 187-7 at 2 (Ciskey Dep. 7:8–18).  But, Dr. Corbier was responsible for overseeing clinical activities.  Doc. 187-5 at 1 (Corbier Aff. ¶ 2).  He attests that he participated in collaborative discussions with other clinicians about inmates with particularly challenging clinical presentations or complicated treatment regimens during regular utilization management meetings involving multiple providers of different backgrounds and specialties.  *Id.*

Dr. Corbier never provided direct medical care to Mr. Davis during his incarceration.  *Id.* at 2 (Corbier Aff. ¶ 5).  But, he attests that he is aware of the care that was provided to Mr. Davis

"through [his] participation in the regular utilization management meetings." *Id.* The summary judgment record identifies just one utilization management meeting involving Dr. Corbier and other providers where they discussed the care and treatment plan for Mr. Davis. Doc. 201-7 at 2–6 (Corbier Dep. 75:2–79:14); Doc. 201-3 at 2–3 (Administrative Note documenting March 31, 2017 meeting). Also, Debra Lundry, R.N. (Corizon Health Services Administrator "HSA") testified that Dr. Corbier did not participate in weekly meetings to discuss patient care. Doc. 209-15 at 63 (Lundry Dep. 63:2–6).

### Requests for Medical Care

For "non-emergent clinical services" in the high security setting of KDOC's prisons, inmates used a "sick call system." Doc. 187-5 at 1–2 (Corbier Aff. ¶ 3). The "sick call" system required inmates seeking healthcare services to submit a form asking for an appointment with healthcare personnel. *Id.* When an appointment was available at the clinic, the inmate "would be sent for" and was permitted to come to the on-site clinic. *Id.* Around the time of the care, on-site personnel created medical records summarizing the encounter. *Id.* Staff created a patient medical chart for each inmate who visited the on-site clinic. *Id.* If an inmate submitted a sick call request, but then refused to present to the clinic when summoned, staff would create a form documenting that refusal as a standard practice. *Id.*

### Mr. Davis's Documented Medical History

On May 17, 2013, while in custody at the El Dorado Correctional Facility, Mr. Davis received a mental health evaluation which diagnosed a personality disorder with anti-social features. Doc. 201-6 at 61. The evaluation form noted that Mr. Davis "[d]emonstrates thinking errors and disregard for other's rights." *Id.*

On June 25, 2014, Mr. Davis was transferred to the Hutchinson Correctional Facility. Doc. 201-6 at 59.  In October and November 2015, several nurses and a provider saw Mr. Davis for left knee pain.  *Id.* at 50–58.

On February 27, 2016, Mr. Davis received a behavioral health evaluation when he was placed in segregated housing.  *Id.* at 48–49.  In April 2016, Mr. Davis complained of a headache. *Id.* at 46.  A nurse saw Dr. Davis about the complaint within six hours of onset of the headache. *Id.*  Also in April 2016, Mr. Davis refused treatment for possible complaints of back pain.  *Id.* at 45.

On May 7, 2016, Mr. Davis complained of bilateral knee pain.  *Id.* at 43.  Nursing staff recorded that Mr. Davis "report[ed] he has done an excessive [amount] of Burpees for years and believes this could be the cause of his pain."  *Id.*  On May 20, 2016, Dr. Michael Dobbs evaluated Mr. Davis and gave him a physical exam.  *Id.* at 39–42.  Dr. Dobbs noted:  "Patient advised that his work-outs are the source of his problems, but he does not want to stop.  Advised resting would help, but he does not want to do that either."  *Id.* at 42.

In June 2016, Mr. Davis received a behavioral health evaluation when he was placed in segregation after "he got a battery charge during visitation."  *Id.* at 37.  On July 9, 2016, Kelbi Stierwalt, a licensed practical nurse, saw Mr. Davis for complaints of a skin rash on his torso.  *Id.* at 34–36.  Mr. Davis reported that he had the skin rash since high school.  *Id.* at 35.  On July 11, 2016, Nurse Practitioner Nancy Ciskey and other nurses saw Mr. Davis for a headache, elevated blood pressure, and a rash on his chest.  *Id.* at 31–33.  Nurse Practitioner Ciskey diagnosed Mr. Davis with a fungal infection of the skin and started an oral anti-fungal medication.  *Id.*  Mr. Davis's medical records noted a "plan" to follow up on his elevated blood pressure.  *Id.* at 32. On July 13, 2016, Mr. Davis received a tuberculosis test with negative results.  *Id.* at 30.

On July 26, 2016, Mr. Davis complained of numbness in both feet. *Id.* at 25. He reported that it "[b]egan suddenly" about a week ago. *Id.* at 26. Nursing staff examined Mr. Davis and noted he had no swelling. Nursing staff noted that the timing of his symptoms coincided with Mr. Davis taking new blood pressure medication. After consulting with the on-site physician, the nurse received an order to decrease Mr. Davis's blood pressure medicine. *Id.* Later, Dr. Karl Saffo performed a health assessment that included a history and physical exam. *Id.* at 27–29. Dr. Saffo noted that Mr. Davis was experiencing a headache. *Id.* at 27. The next day—July 27—Mr. Davis was scheduled to see a mental health counselor, but he "did not show up" because he had "decided to go to [the] yard instead." Doc. 187-9 at 5. On July 29, 2016, a nurse evaluated Mr. Davis and found him to have a slow heart rate of 45 beats per minute. Doc. 201-6 at 23–24.

On August 1, 2016, Nurse Practitioner Ciskey saw Mr. Davis for a blood pressure check. *Id.* at 19–22. She noted that Mr. Davis reported numbness in his feet. *Id.* at 19. But, she also noted that Mr. Davis had quit taking his blood pressure medication and the numbness was "resolving." *Id.* Nurse Practitioner Ciskey recorded that staff reviewed Mr. Davis's labs with him and educated him about his hypertension, diet, and exercise. *Id.* at 21. Staff also prescribed Mr. Davis a different blood pressure medication and scheduled him for an electrocardiogram (EKG) in three months. *Id.* The next day, Mr. Davis received an emergency visit with a nurse after complaining of a migraine. *Id.* at 16–18. Mr. Davis reported his pain at a 1 out of 10 and at worst a 3 out of 10. *Id.* at 17. His vital signs and neurological status were normal, and a nurse provided him with Tylenol. *Id.* at 16–18.

On August 11, 2016, Mr. Davis was seen by a nurse in sick call because he had complained the day before of eye pain but he refused treatment because he was "tired of

waiting." *Id.* at 14–15.  After the nurse visit, Mr. Davis was cleared to work in the kitchen.  *Id.* at 14.

On August 26, 2016, Mr. Davis participated in another nurse visit for a complaint of "back pain (nerve)." *Id.* at 11.  Four days later, another nurse saw Mr. Davis for "knee pain 2nd request." *Id.* at 9.  Then, on September 1, 2016, another nurse saw Mr. Davis for a "3rd" sick call for "back pain." *Id.* at 6–8.

On September 5, 2016, Mr. Davis participated in a nurse visit where he complained about "numbness" in his legs and reported that he had fallen in the cell block.  Doc. 187-11 at 1.  Nursing staff examined Mr. Davis and documented that the numbness primarily was on the back of the right leg and bottom of both feet.  *Id.*  Mr. Davis also reported back pain to the thoracic spine.  *Id.*  The medical record notes that Mr. Davis had full range of motion and no bulges on his spine.  *Id.*

On September 7, 2016, Mr. Davis participated in another nurse visit.  Doc. 201-6 at 3.  He complained of "[b]ack pain half of my body numb barely can walk on my legs can feel them." *Id.*  The nurse also noted that Mr. Davis "missed" his appointment "[d]ue to the fucking police not letting [him] out[.]" *Id.*  Two days later, a registered nurse (RN) documented that Mr. Davis had a chief complaint of upper back pain since August 26, 2016, which he had never experienced before.  *Id.* at 1.  The RN noted that Mr. Davis' appointment with the provider was "rescheduled for Monday." *Id.* at 2.  Also, the RN noted that Mr. Davis was having trouble walking and required two officers to assist him into the exam room.  *Id.*  Mr. Davis also reported that his "lower leg [was] numb." *Id.*

On September 10, 2016, Faye Vargas, R.N. noted that Mr. Davis's mother had reported to prison staff that her son was complaining of leg pain and that he was not receiving medical

treatment for the pain.  Doc. 201-5 at 89.  Ms. Vargas noted that nursing staff had seen Mr. Davis

and that he was scheduled for a follow up visit the following week.  *Id.*  The record also noted

that prison staff just had observed Mr. Davis going out to the exercise yard.  *Id.*  Also on

September 10, Dr. Sohaib A. Mohiuddin examined Mr. Davis for his complaints about back and

leg pain.  *Id.* at 85–87.  Mr. Davis reported that he had "no back pain at this time[.]"  *Id.* at 85.

Dr. Mohiuddin prescribed an anti-inflammatory (Mobic) and Tylenol and ordered lumbar spine

x-rays series to evaluate Mr. Davis's back pain.  *Id.* at 86.

Over the next several weeks, several different nurses saw Mr. Davis several times for

constipation, chest pain, and continued leg problems.  *Id.* at 69–84.  Mr. Davis's records for

September 12 note that he was complaining of headaches and numbness in his right leg.  *Id.* at

80.  The September 13 and 15 records note that Mr. Davis was complaining of lower leg

numbness and nerve pain in his right leg.  *Id.* at 73–74.  On September 13, Nurse Practitioner

Ciskey evaluated Mr. Davis for his chest pain, performed an EKG, and found that he didn't have

any cardiac issues.  *Id.* at 75, 79.

On September 16, 2016, Mr. Davis received a lumbar spine x-ray.  *Id.* at 88.  The records

from the x-ray note the following impression:

> 1.      NEGATIVE FINDINGS FOR ACUTE FRACTURE OR
> SPONDYLOLISTHESIS.
> 2.      ATYPIA OF THE TRANSVERSE PROCESSES L1 WITH PARTIAL
> LUMBARIZATION S1–2.  THESE FINDINGS ARE FELT TO REPRESENT
> DEVELOPMENTAL VARIATION.

*Id.*

On September 20, during a sick call visit, Mr. Davis reported:

> My ability to walk is severely impaired as I have no motor, mus[c]le skill control
> with my right leg.  Please schedule appointment w/ DR so I can get a cane.  Every
> time I stand my leg buckles I nearly fall down.  I use the wall to brace myself to
> keep standing and often lose my balance.  Please help me!

*Id.* at 69.  During that same visit, Mr. Davis told Nurse Practitioner Ciskey that he felt his leg

symptoms "happened using broken machine for leg press." *Id.* at 70.  A nurse took Mr. Davis's

vitals and noted Mr. Davis walked in with a "pronounced limp" but it was "less pronounced

when leaving [the] clinic." *Id.*  The records note that Mr. Davis was scheduled to meet with a

doctor to review the results of his x-ray. *Id.*

On September 22, 2016, HSA Lundry spoke by phone with Shermaine Walker, Mr.

Davis' mother. *Id.* at 68.  HSA Lundry recorded the following note about her conversation with

Ms. Walker:

> Mother wants update on what is being done.  Something is going on with his leg
> and its getting worse.  Right leg is numb and he is at risk of falling.  Assured Mrs.
> Walker that the doctors have viewed his xrays and he will have a follow-up
> appointment with Dr. Mohiuddin.  Nursing notified to add to CMM list and
> evaluate patients [gait].  Issue walker if needed for safety.

*Id.*

Medical staff saw Mr. Davis several more times in September 2016, mostly for the issue

with his leg pain and numbness, but also for a request for a partial denture. *Id.* at 59–67.  During

a September 22 visit, Mr. Davis specifically asked for an MRI, and a nurse reported the

following:

> Pt ambulates to exam room with steady gait, swinging rt leg with knee locked at
> each step.  Pt denies any back or leg pain today.  He describes the sensation of
> numbness at times from below the rt knee down to foot, other times from below the
> axillary region down to his feet, lasting 3-4 seconds.  He also says it is worse in the
> morning when he gets up, but is best (not effecting him) while at yard.  No swelling
> or bruising noted.  Walker issued to pt, receipt of equip signed.  Pt asks if he will
> be scheduled with a doctor, saying "I need an MRI because it has to be a nerve[."]
> Pt ed he is currently scheduled to see an HCP.  Denies further need or concern
> today.

*Id.* at 66.  On September 28, Dr. Mohiuddin examined Mr. Davis again and recorded

P[a]tient is able to ambulate into the clinic with a slight limping (with a cane) appearance along the right leg.  Patient has no signs of asymmetry of the right leg muscles in comparison the left which makes me think this is less a muscle innervation issue.  Patient has no urinary problems that would . . . be seen with spinal cord issues.  Given patient[']s history of having an injury in the past while playing sports, his symptoms could be related to muscle weakness and could be a pulled/movement injury.  Patient reports no other complaints at this time.

*Id.* at 59.  Dr. Mohiuddin noted that Mr. Davis's lumbar spine x-rays did not note any findings that would explain his symptoms.  *Id.* at 60.  Dr. Mohiuddin recorded this assessment and plan:

- no sports or strenuous activities at this time
- advised him to do a lot of rest and to not sleep on the right side at night
- he will continue to take Mobic to see if that is bringing relief, will plan to re-check his Cr as it was a little high at 1.4 and is hopefully from dehydration then any renal issue.
- told patient to report to clinic immediately if his pain or symptoms worsen so he could be re-evaluated by HCP.

*Id.*

In October 2016, nursing staff saw Mr. Davis twice for continued complaints of a headache and lower leg pain.  *Id.* at 54–58.  But, on October 20, Mr. Davis returned his walker because he "[n]o longer need[ed] to use it."  *Id.* at 54.  However, he still was complaining of a headache, which he rated at a pain level of 4 out of 10.  *Id.* at 57.  He reported that "working out" made the pain worse.  *Id.*

On October 25, 2016, Dr. Karl Saffo gave Mr. Davis a chronic care assessment.  *Id.* at 52–53.  Dr. Saffo performed a history and physical examination.  *Id.*  Dr. Saffo noted in his assessment/plan that Mr. Davis "complained of weakness in the right leg for the last 2 months."  *Id.* at 53.  But, that he has "no pain" and "was lifting weight and doing push ups."  *Id.*  Dr. Saffo noted that Mr. Davis's "limping is very visible" and that he "has some muscle weakness in his Right lower extremity."  *Id.*  Dr. Saffo reported that he would "talk to the UM nurse to find out if

Dr. Corbier will approve EMG studies." *Id.* Dr. Saffo also instructed Mr. Davis not to lift weight or do pushups and "no running either." *Id.*

On October 27, 2016, Registered Nurse Yvette D. Hefner documented a Nursing Progress Note. Doc. 209-11 at 4. Nurse Hefner noted that Mr. Davis reported "subjective" complaints of "swelling in feet, multiple sick calls and doctor visit pertaining to [his] right leg an[d] lower body numbness/tightness in lower back." *Id.* Nurse Hefner noted that Mr. Davis saw "HCP" on October 25, and that the "HCP" had recommended a referral for MRI. *Id.* Also, Nurse Hefner noted that the "HCP state[d] he needs to get with Dr. Corbier about EMG studies." *Id.*

Also, on October 27, Registered Nurse Jennifer Helus entered a request for the electromyography (EMG) study which Dr. Saffo had recommended. Doc. 209-11 at 3. Dr. Corbier approved the referral that same day. *Id.* The "urgency" of the request was "routine— within 30 days." *Id.* The request noted a diagnosis of "leg muscle weakness" and that Mr. Davis had reported that "he was lifting weight 2 mths and has experienced R leg weakness since then" but he denied any pain. *Id.* Nurse Helus documented that Mr. Davis was "functional" but "walks with an obvious limp[.]" *Id.* The next day, Nurse Helus documented that Dr. Corbier had approved the EMG on October 27, and that an appointment was scheduled with Neurology Consultants of Kansas for November 21, 2016. *Id.* at 5.

On October 28, 2016, HSA Lundry spoke by phone with Mr. Davis's mother and recorded this note:

> Spoke with mother regarding status of patient. Informed that he had seen Dr. Mohiuddin and Dr. Saffo. There is a EMG pending for approval. IM returned his walker and was instructed not to lift weights at this time. Labs reviewed. Informed mother there is no established diagnosis at this time. We will also require stool for OB to be done to verify blood in stools. She is concerned but very pleasant to talk with.

13

Doc. 201-5 at 51.

On October 31, 2016, Dr. Saffo evaluated Mr. Davis again and documented this note

about Mr. Davis:

> He is here today because he is limping with his Right Lower Extremity due to
> muscle weakness since he has never had pain. He also feels numbness in both lower
> extremity. These symptoms started 2 months ago. He has no pain in the back or in
> the legs. He has lost the Vibration test in the right leg while it is preserved in the
> left leg. In the supine position, straight leg raising test was 90 degrees on both sides
> without pain. Raising the right leg by his muscle strength is impaired to 30 degrees
> compared to the left leg at 90 degrees. He is approved for EMG studies of both
> lower extremities. Monofilament of the right leg was positive as he did not
> feel it while he was normal on the left side. Vibration test was normal on the left
> side and abnormal on the right side.
>
> Dx; Muscle weakness of the right lower extremity awaiting the results of the EMG
> studies.

*Id.* at 48–49.

Throughout November 2016, several different nurses saw Mr. Davis for gastrointestinal

(GI) complaints, continued complaints of lower extremity numbness, and one complaint of

numbness in arms. *Id.* at 8–47. On November 21, 2016, Mr. Davis went for his outside

appointment with the neurologist. *Id.* at 23. Nurse Helus documented this note upon his return:

"Pt's EMG per Dr. Reddy was normal. Pt to f/u with onsite HCP." *Id.* On November 22, 2016,

Nurse Helus added this note:

> **Subjective:**
> Pt to be scheduled with HCP to discuss recent EMG results from Dr. Reddy. Per
> Dr. Reddy, results were normal and on-site HCP to f/u for subjective weakness.
>
> **Plan:**
> Gaines notified to schedule w/ HCP.

*Id.* at 17.

Over the next several weeks, Mr. Davis had several visits with nursing staff to address complaints of pain swelling in his back. *Id.* at 1–7. On December 7, 2016, HSA Lundry documented this phone call with Mr. Davis's mother:

> Call regarding weakness. Duration of varies. Spoke with Mother to inform of current plan to treat weakness. Informed her of NEG stools for blood, Neg EMG testing that was done on 11/28/16. Nursing saw pt on Dec 3rd and describes fluid filled area on lower back. Will schedule first available appointment with physician.

*Id.* at 4.

On December 8, 2016, nursing staff saw Mr. Davis in sick call and documented this note:

> **Extremities:**
> Gait symmetrical
>
> Comments:
> Difficult to communicate with patient regarding his problem. Exam of lower back reveals a small soft raised area to mid lower back. Not tender with palpation. Denies pain or discomfort. Patient had an outside appt with Dr Reddy and an EMG was done 11–21–16 which was normal. Currently scheduled with on site HCP to discuss the results of the EMG. Pt educated of upcoming HCP appt.

*Id.* at 2.

On December 13, 2016, Mr. Davis made a sick call request where he complained of symptoms he had experienced for "3–4 months" including "tingling, numbness, tightness an[d] heaviness [i]n leg[s] e[s]pecially right leg" and "[p]ain shooting down both arm[s,] lower back swollen[,] possible fluid on spine, also tightness in lower back and right leg [which] goes to sleep every 20–30 seconds [and] buckle[s] at knee." Doc. 201-4 at 88. Mr. Davis reported that he was not cleared to work in the kitchen because of his pain issues. *Id.* at 89. The nurse notified "officer, unit team, and Aramark that [Mr. Davis was] not [to] work in the kitchen[.]" *Id.*

On December 14, 2016, Nurse Helus documented that she discussed Mr. Davis's case with Dr. Mohiuddin and a possible MRI in the future. *Id.* at 87. Also, Dr. Mohiuddin made a request for "CPT Radiology Diagnostic Ultrasound." Doc. 209-11 at 7. On December 15, 2016,

Nurse Helus documented Dr. Corbier's response to Dr. Mohiuddin's request.  Doc. 201-4 at 86.

Dr. Corbier proposed an "alternative treatment plan" of continuing "to monitor size and texture

of mass.  Lipoma?  Don't see relationship with R. leg weakness.  Need full

neurologic/musculoskeltal exam.  If lab is abnormal please let me know."  *Id.*  Nurse Helus

documented the "OPR response" and notified Dr. Mohiuddin of Dr. Corbier's response.  *Id.*

On December 16, 2016, Dr. Mohiuddin performed a "Provider Visit" with Mr. Davis that

included a physical examination.  *Id.* at 82–85.  Dr. Mohiuddin documented the following history

for Mr. Davis:

> History of Present Illness:
> 1.  Follow Up of Review EMG results/back pain
> Approx 3 months ago pt. was lying on squat machine and believes that may have
> been source of injury, but unsure.  3 months ago, patient reports feet going numb.
> Motor function always intact.  Numbness has improved and nearly resolved.
> Patient was informed that the EMG results were negative.
>
> Patient does have some mild weakness of the tibialis anterior (Right > Left) with
> minimal difference between the Right and Left leg (4.5/5.0 on the Right and 5.0/5.0
> on the Left).  Otherwise the remaining evaluation of the upper and lower extremity
> musculature shows no focal motor findings.  In terms of sensory problems, patient
> states that he continues to have numbness and burning that radiates down the back
> of his upper thighs, however his prior numbness in the toes (1st through 3rd digit
> of the right and left foot) have improved, however not completely resolved.  When
> evaluating for numbness it was difficult to determine since the patient seemed to
> give inconsistent responses, but overall he did state that his numbness in the toes is
> improving.
>
> Patient reportedly has been going to "yard" but states [that] he is not doing any
> lifting.  There have been reports of patient being physically active with weights in
> the past, and patient was again reminded that he should not be doing any weight
> lifting activities [at] this time.  Documentation provided in the clinic to me by
> officers shows that patient is actively going to yard and potentially doing activities
> that could be exacerbating his back pain.
>
> Additionally on 12/19/16, HSA was informed by family member that patient's
> mother has lupus.  Although patient[']s symptoms do not appear to be related to
> any signs of lupus, will do a further chart review to see if there any other
> information in the patients history that could point towards signs of lupus.

> Patient's BP is within normal limits.  It appears that he is on lisinopril, however given the elevated Cr on most recent labs, will plan to stop lisinopril as patient at this point may not need BP medication.  Also, it appears that patient has taken NSAIDs in the past that also need to be stopped till we can confirm that his Cr level has improved.  Advised patient to drink plenty of water and less soda and/or coffee.

*Id.* at 82.  Dr. Mohiuddin noted Mr. Davis's continued leg pain and that he walked with a limp.

*Id.* at 84.  He also noted that an infection of the spine might be causing Mr. Davis's symptoms.

*Id.*

On December 19, 2016, HSA Lundry documented another phone conversation with Mr.

Davis's mother:

> Spoke with patient[']s mother via phone.  Ms. Walker is concerned about her son receiving an MRI.  Reported that Mr. Davis was seen by Dr. Mohiuddin on the 16th.  Documentation is pending but he plan[n]ed to submit for an MRI.  She is concerned that it is taking so long to find out what his diagnosis might be.  She informed me today that her family had a history of LUPUS and was wondering if this may be LUPUS.  I will inform Dr. Mohiuddin of this information.

*Id.* at 81.

On December 27, 2016, Mr. Davis met with a nurse in sick call.  Doc. 209-11 at 8.  He

reported that he could feel lumps in his chest and right tricep, that his stomach hurt, and that he

felt "like something [was] eating [his] own brain."  *Id.*; *see also* Doc. 209-15 at 105–06 (Lundry

Dep. 105:16–106:12).  Also, he complained that his walking was "getting more severe[,]" that he

was getting dizzy "a lot" and feeling like he was going to pass out, and that he was having "hot

sweats."  Doc. 209-11 at 8.  The nurse reported that Mr. Davis's "chief complaint" was that he

wanted "to know when he [was] getting his MRI[.]"  Doc. 227-2 at 2.  The nurse documented

that Mr. Davis said he didn't "need to be seen for what he put on his sick call" and reported he

had Tylenol already.  *Id.*  Also, the nurse noted that Mr. Davis's gait "was steady when walking

into the examination room."  *Id.*

Dr. Corbier testified that he recalled hearing that Mr. Davis had reported that he felt like "something was eating his brain" but he didn't recall when. Doc. 209-19 at 138 (Corbier Dep. 138:11–16). He testified that the reason no one ordered an MRI of Mr. Davis's brain in December 2016—when he made the comment about "something was eating his brain"—was because he didn't have "symptoms to suggest intracranial pathology requiring a brain MRI." *Id.* at 138–39 (Corbier Dep. 138:17–139:9).

On December 29, 2016, Nurse Helus documented a request by Dr. Mohiuddin for an MRI exam of Mr. Davis's lumbar spine. Doc. 201-4 at 80. The urgency was listed as "routine— within 30 days." *Id.* The request noted that Mr. Davis's previous treatment included a November 21, 2016 "EMG w/ Dr. Reddy" which "was normal." *Id.* Nurse Helus documented the following about Dr. Mohiuddin's December 16, 2016 examination:

> Patient does have some mild weakness of the tibialis anterior (Right > Left) with minimal difference between the Right and Left leg (4.5/5.0 on the Right and 5.0/5.0 on the Left). Otherwise the remaining evaluation of the upper and lower extremity musculature shows no focal motor findings. Pt cont to have numbness in 1st–3rd R & L toes. No signs of gross foot drop. Does have some mild asymmetric appearance of dorsal musculature posterior back region.

*Id.* Nurse Helus documented that Mr. Davis was "[f]unctional" and "walks with inconsistent limp & reports mild motor weakness in R leg[.]" *Id.* Also, the document notes that Mr. Davis has reported a family history of MS and Lupus. *Id.* Dr. Corbier electronically signed the request on December 29. *Id.*

On January 2, 2017, Nurse Helus documented that Dr. Corbier had approved the lumbar MRI on December 29, 2016, and that the test was scheduled for January 10, 2017. *Id.* at 79. On January 10, 2017, Nurse Helus documented that Mr. Davis received a lumbar spine MRI and that the results were normal. *Id.* at 78.

In January 2017, Mr. Davis visited sick call twice with continued neurological complaints and a report that he had passed out. *Id.* at 69–77.  On January 27, 2017, Nurse Helus documented in a progress note that Mr. Davis was "to begin Prednisone" and "placed in the infirmary for monitoring of symptoms of fainting, weakness, extremity tingling/numbness, difficulty ambulating, constipation xs 1 mth." *Id.* at 68.  The progress note recorded that Mr. Davis's MRI on January 10, 2017, and EMG on November 21, 2016, were normal. *Id.*

On January 27, 2017, Mr. Davis was transferred to the infirmary. *Id.* at 66–67.  Dr. Mohiuddin saw Mr. Davis that day via telehealth. *Id.* at 67.  On January 31, a nurse noted on Mr. Davis's infirmary records that he was walking well and "no limping noted." Doc. 187-15 at 8.  On February 1, 2017, Mr. Davis refused treatment, but the form doesn't provide an explanation for his refusal.  Doc. 187-16 at 1.

On February 10, 2017, Nurse Helus documented a request from Dr. Mohiuddin for a neurologist consultation with Mr. Davis.  Doc. 201-4 at 65.  On February 13, 2017, Nurse Helus documented Dr. Corbier's response. *Id.* at 64.  Dr. Corbier proposed an "alternative treatment plan" to "[w]ork up negative" and noted that "PE not too impressive." *Id.*  Dr. Corbier questioned whether they had "considered a trial of PE?" *Id.*  And, Dr. Corbier included a request to let him "know" if "a neurologic condition is being considered[.]" *Id.*  Dr. Corbier also instructed to "continue to monitor neurologic sig[.]" *Id.*

On February 11, 2017, a nurse noted "no abnormality" in Mr. Davis's gait when he is "unaware he is being watched" but when "he is aware someone is watching him . . . he then has a significant limp." Doc. 187-16 at 31.  On February 14, 2017, a nurse practitioner evaluated Mr. Davis in the infirmary and determined that he was stable for discharge from the infirmary with follow-up in one week.  Doc. 201-4 at 62–63.  The record notes Mr. Davis's symptoms of "lower

extremity weakness and dizziness" and "some low back pain for about 4 months." *Id.* at 63.

Also, the record reports "no cause found for these issues." *Id.*

On February 21, 2017, Mr. Davis had his follow up visit with a nurse.  He reported mild

but constant symptoms of pain in his lower extremities and that his legs felt "tight and tired." *Id.*

at 58.  The report notes that Mr. Davis was using a walker and that he was "not happy that his

neuro consult was not approved." *Id.* at 60.  On February 23, 2017, Mr. Davis had a mental

health assessment where he reported hearing voices and having visual hallucinations. *Id.* at 56–

57.

On February 23, 2017, Mr. Davis was evaluated by a nurse practitioner after he almost

fell. *Id.* at 54–55.  Mr. Davis complained of dizziness and that he was "having trouble tracking

with [his] eyes." *Id.* at 55.  The nurse practitioner ordered urinalysis and an EKG. *Id.*  Mr. Davis

refused the EKG because he had an EKG performed just two days earlier, on February 21.  Doc.

187-16 at 38.

On February 27, 2017, Mr. Davis was admitted to the infirmary on a 23-hour observation

admission so that a provider could assess him and he could receive intravenous fluids.  Doc. 201-

4 at 47–50.  Mr. Davis was discharged back to his housing unit on February 28, 2017. *Id.* at 48.

### *Review and Oversight of Mr. Davis's Medical Care*

Mr. Davis's mother—Shermaine Walker—asked for many reviews of Mr. Davis's

medical care, including one request made in February 2017.  Doc. 187-5 at 3 (Corbier Aff. ¶ 8).

The Kansas Department of Corrections ("KDOC") complied with the request, and an outside

independent practitioner—Margaret L. Smith, M.D.—reviewed Mr. Davis's care. *Id.* (Corbier

Aff. ¶ 8); Doc. 187-6.  KDOC oversees the medical services provided to prisoners in its custody

by third-party contracting entities.  Doc. 187-5 at 3 (Corbier Aff. ¶ 7).  This oversight process is managed by KDOC, not Corizon.  *Id.*

Occasionally, Dr. Corbier would receive feedback on specific cases that were reviewed by University of Kansas Medical Center clinical physicians.  *Id.*  Dr. Corbier attests that it was his practice to incorporate the feedback received from these reviews into the utilization management meetings to make decisions about individual plans of care.  *Id.*  On February 23, 2017, Dr. Corbier received a copy of the "review" conducted by Margaret Smith, M.D.  *Id.* (Corbier Aff. ¶ 8).  Dr. Smith's one-page report specifically recites "clinical staff" reviewed the case based on a concern raised by Mr. Davis's mother "that he might have multiple sclerosis." Doc. 187-6.  Dr. Smith's report never identifies the information that the "clinical staff" reviewed to reach the conclusions in the report.  *Id.*

Dr. Corbier attests that the feedback from the "review" confirmed to him and the Corizon clinicians that "all reasonable diagnostic testing had been performed, there were no reasonable alternatives that [they] were missing, and that the best course was continued observation over time to see if a diagnosis would present itself."  Doc. 187-5 at 3 (Corbier Aff. ¶ 9).  Dr. Corbier attests that the "results of the review did not communicate any concern of a risk of serious harm to Mr. Davis through continued observation, and in fact suggested that additional invasive testing would be unreasonable."  *Id.*

As discussed in more detail below, on March 31, 2017, several health care providers, including Dr. Corbier, convened a "multidisciplinary team meeting" to discuss Mr. Davis's symptoms and plan of care.  Doc. 201-7 at 2–6 (Corbier Dep. 75:2–79:14).  Between July 2016 and April 2017, Mr. Davis received a "wide variety of diagnostic testing" and "laboratory

analysis was repeated many times in an effort to find an explanation for the symptoms."  Doc.
187-5 at 2 (Corbier Aff. ¶ 6).

### *Mr. Davis's Continued Symptoms*

On March 8, 2017, Mr. Davis visited the health care unit for an "emergency response."
Doc. 201-4 at 45–46.  The report from this visit notes that Mr. Davis complained of "feeling
dizzy." *Id.* at 46.  Also, Mr. Davis asked when he was "getting sent out for Neuro appointment?"
*Id.*  On March 15, 2017, a nurse saw Mr. Davis at a sick call.  *Id.* at 43–44.  Mr. Davis again
complained of "dizziness" and also "erectile dysfunction" and "loss of balance[.]"  *Id.* at 44.  The
report for this visit recites that a "referral already [was] in place for neuro and that inmate is not
to be aware of appt.  Inmate informed he would be referred back to a doctor.  Inmate stated
understanding." *Id.*  On March 19, 2017, another nurse saw Mr. Davis in sick call.  *Id.* at 39–42.
Mr. Davis complained of headache, dizziness, and difficulty walking.  *Id.*  The nurse noted Mr.
Davis's request for a wheelchair and informed utilization management of that request.  *Id.* at 41–
42.

On March 20, 2017, Dr. Saffo evaluated Mr. Davis.  *Id.* at 36–38.  Dr. Saffo noted that
Mr. Davis was complaining of migraines and weakness in the right lower extremity as well as
weakness all over his body and dizziness.  *Id.* at 36.  Dr. Saffo noted this "has been going on for
6 months." *Id.*

Also on March 20, HSA Lundry documented a telephone conversation that she had with
Mr. Davis's mother.  Doc. 209-11 at 18.  Mr. Davis's mother had called about "dizziness" that
was going on six months.  *Id.*  His mother reported that she had visited that past weekend, and
she was "very very concerned" about her son's condition.  *Id.*  Mr. Davis told his mother that he
was getting "worse[,]" was "[v]ery dizzy," and "cannot walk."  *Id.*  His mother reported that Mr.

Davis was unable to stand and almost fell, and that he was using a walker. *Id.* Mr. Davis's mother reported that she felt there was "something wrong" with her son, something that was "changing him." *Id.* His mother wanted to know who she could talk to about her son. *Id.* HSA Lundry documented that she explained to Mr. Davis's mother "all the tests" performed to "find something wrong" with Mr. Davis. *Id.* She reported that nothing was found "after extensive testing." *Id.* HSA Lundry noted that she anticipated "continued telephone calls" and that she would "notify Dr. Corbier for his recommendations." *Id.*

On March 21, 2017, Mr. Davis was admitted to the infirmary for a short-term observation admission to collect a 24-hour urine specimen. Doc. 201-4 at 32–35. On March 22, 2017, Nurse Helus documented the decision by utilization management on Mr. Davis's request for a wheelchair. *Id.* at 31. She reported that Mr. Davis was "not approved for a [wheelchair] at this time." *Id.* She noted that Mr. Davis was "currently housed in the infirmary for testing and has no issues with ambulation witnessed by Nursing." *Id.*

On March 25, 2017, Mr. Davis was admitted to the infirmary after he passed out. Doc. 201-3 at 80–90. Mr. Davis was given intravenous (IV) fluids. *Id.* at 82, 90. Nurse Practitioner Ciskey performed an evaluation on Mr. Davis after he was admitted to the infirmary. *Id.* at 80–83. She noted a "[c]hange in behavior" by Mr. Davis and that he was "inappropriate with staff." *Id.* at 81. And, she noted that Mr. Davis was placed in an isolation cell. *Id.* Also, Nurse Practitioner Ciskey documented an assessment and a plan that included an assessment every shift and monitoring Mr. Davis's vitals. *Id.*

Mr. Davis remained in the infirmary for possible dehydration. Doc. 201-3 at 4–90; Doc. 201-4 at 1–30. Nursing staff saw Mr. Davis multiple times a day, and medical providers saw him on a near-daily basis. *Id.* The medical records report that Mr. Davis was urinating in his

water pitcher, having difficulty walking or standing, acting inappropriately with nursing staff including by showing staff his buttocks, and stuttering and slurring his speech.  Doc. 201-3 at 19, 30, 36, 41–42, 53, 69, 73, 80, 84–85; Doc. 201-4 at 2.

On March 27, 2017, Nurse Practitioner Ciskey documented an assessment of "dehydration" and a patient plan for Mr. Davis that included administering "hemoccult x 3[,]" continuing to monitor symptoms, and a review in utilization management.  Doc. 201-3 at 72–74. Nurse Practitioner Ciskey testified that she believed Mr. Davis needed a neurological consult based on Mr. Davis's symptoms and the fact that other testing and the EMG reported normal results.  Doc. 209-20 at 32 (Ciskey Dep. 32:1–8).

On March 28, 2017, Nurse Practitioner Rhonda Durant assessed Mr. Davis and documented that he appeared to be "doing better" with a level of consciousness that was "normal."  Doc. 201-3 at 58.  However, he still was experiencing "dizziness."  *Id.* at 57.

On March 30, 2017, Mr. Davis had a mental health consultation.  *Id.* at 19–20.  The record from that visit documented that Mr. Davis was "frustrated because no one can seem to figure out what is wrong with him."  *Id.* at 19.  Mr. Davis reported that his symptoms started "with his leg and now he is hearing voices."  *Id.*  The record notes that Mr. Davis was urinating in his pitcher because "it was easier to do that than to get up and go to the toilet."  *Id.*  The record documented Mr. Davis's "changes" in behavior including that he was exposing himself to nursing staff.  *Id.*  Also, it documented that Mr. Davis wasn't "eating well" because he had no appetite but also that he didn't like the food provided.  *Id.*  And, it noted that Mr. Davis had lost at least 10 pounds.  *Id.* at 20.  The mental health assessment concluded that Mr. Davis did "not present any mental health issue at this time."  *Id.*

On March 29, 2017, Nurse Practitioner Ciskey documented infirmary rounds.  *Id.* at 41. She noted that Mr. Davis reported today that "he is urinating in the pitcher and cups because he is too 'lazy' to get up and go."  *Id.*  Ciskey documented Mr. Davis's temperature as 100 F.  *Id.* at 42.  Ciskey noted that based on a "[r]eview of chart, patient didn't have an MRI or CT of brain. He did have an EMG and MRI of spine, ANA, and Sed Rate are normal."  *Id.*  She also noted Mr. Davis had "a weight change of 10lbs" but that he was wearing "long [j]ohns" and "on a different scale."  *Id.*  Ciskey documented that Mr. Davis was educated not to urinate in the same pitcher he is drinking from, which he verbalized his understanding.  *Id.*

On March 30, 2017, Nurse Practitioner Ciskey documented an assessment of Mr. Davis. *Id.* at 10–11.  The document noted the reason for Mr. Davis's admission to the infirmary was "dehydration."  *Id.*  And, it reported Mr. Davis's blood pressure as 104/66, his temperature as 99.2 F, and his pulse oximetry as 94.  *Id.*  Ciskey noted that Mr. Davis was "refus[ing] to be seen" and stating that he "just wants to leave."  *Id.* at 11.  Also, she noted that Mr. Davis was eating only 25% of his meals.  *Id.*  Also, she noted that a multidisciplinary team meeting was scheduled for tomorrow and that "Dr[.] Corbier to determine plan tomorrow."  *Id.*  Nurse Practitioner Ciskey documented a patient plan that included continued monitoring of Mr. Davis, encouraging meals, and continuing the "plan of care."  *Id.*

### March 31, 2017 Multidisciplinary Team Meeting

On March 31, HSA Lundry documented an "administrative note" about the multidisciplinary team meeting.  *Id.* at 2–3.  She noted that the meeting's "issue" was to "[d]iscuss patient plan of care" for Mr. Davis, and that several providers attended the meeting including Dr. Corbier, Dr. Mohiuddin, Dr. Saffo, and HSA Lundry.  *Id.* at 2.  She recorded follow-up actions including the "[d]ecision to submit for Neuro Consult ASAP."  *Id.*  Also, HSA

Lundry recorded the following:  "DP2 Monthly, Consult Dr. Grimmel, Consult Dr. Wickert for

Eye exam.  followup MDT after Neuro consult completed.  Will notify UM nurse to follow up.

Please keep patient in the infirmary for now under sheltered housing."  *Id.*  Also on March 31,

HSA Lundry spoke with Mr. Davis's mother and documented this note:

> Spoke with Mom again today and updated her on patient[']s plan.  She was
> informed earlier that we would have [a multidisciplinary team] meeting to discuss
> and develop a plan of care.  Update given and she seemed pleased with the outcome.

*Id.* at 1.

### *Mr. Davis's Continued Observation in the Infirmary*

Mr. Davis remained in the infirmary under the care of infirmary nurses who documented

their interactions with him on every shift.  Doc. 201-2 at 87–90.  Nursing staff documented that

Mr. Davis was having trouble speaking and walking and that he complained of dizziness.  *Id.* at

88.  On March 31, 2017, Dr. Mohiuddin evaluated Mr. Davis by telehealth.  *Id.*

On April 3, 2017, Dr. Mohiuddin and Dr. Gordon assessed Mr. Davis.  *Id.* at 75–76.  Dr.

Gordon ordered medication for Mr. Davis.  *Id.* at 75 ("Dr. Gordon was OK with Haldol 3 mg and

benadryl.").  The nurses continued to chart Mr. Davis's symptoms, noting that Mr. Davis was

moaning and groaning, staring straight ahead, shaking, falling, "not acting right," and acting in a

"bizarre" manner.  *Id.* at 75–76, 82.  Also, nurses documented that Mr. Davis was singing and

talking in a "nonsensical" way and to someone not present in the room.  *Id.* at 82.

On April 3, 2017, nursing staff documented a utilization management request made by

Dr. Saffo to refer Mr. Davis for a neurology consultation based on the decision that was made

during the March 31 multidisciplinary team meeting.  *Id.* at 73.  The request marked the

"urgency" as "routine—within 30 days."  *Id.*  The request form noted that Mr. Davis walked with

an inconsistent limp and reported mild motor weakness in his right leg, and that he "acts

confused at times as well." *Id.* The request form was signed electronically by Heather Ungeheuer, APRN, on behalf of Dr. Corbier on May 1, 2017—almost a month after the document was generated. *Id.*

Nurse Helus scheduled Mr. Davis for a consultation with Neurology Consultants of Kansas on June 22, 2017. *Id.* at 72. She noted that this appointment was the "soonest" appointment available, but that Mr. Davis "was placed on a cancellation list for a sooner [appointment] should one become available." *Id.*

On April 3, 2017, Dr. Saffo saw Mr. Davis at the request of the charge nurse. *Id.* at 70–71. Dr. Saffo documented that Mr. Davis was "making noises and producing words that [do] not make sense." *Id.* at 71. Dr. Saffo described Mr. Davis as "incoherent as part of a manic state." *Id.* Dr. Saffo prescribed medication and requested a psychiatric evaluation. *Id.*

On April 5, 2017, Dr. Mohiuddin again evaluated Mr. Davis. *Id.* at 67–68. He noted Mr. Davis reported "mild numbness of the leg and weakness saying that he does not want to stand" but also that he was "'doing much better now[.]'" *Id.* at 67. Dr. Mohiuddin also discussed with Mr. Davis the "side effects" of "drugs that can also cause some of the symptoms that he had." *Id.* Dr. Mohiuddin documented a plan that included a request for a brain MRI, noted that Mr. Davis's symptoms had "improved incredibly in the last 24–48, raising concern for drug withdraw[a]l as a possible etiology[,]" and recited that Nurse Practitioner Ciskey would "follow up[.]" *Id.* at 68. That same day, Dr. Mohiuddin made a utilization management request for "MRI Brain with contrast (Multiple Sclerosis protocol)[.]" *Id.* at 69. The request was described as "Urgent—within 7–10 days[.]" *Id.* Also, the request noted the history of Mr. Davis's symptoms that included vision changes, fecal incontinence, hearing voices, and leg weakness. *Id.* And, the request noted that Mr. Davis "was discussed" in the multidisciplinary team meeting

and that "there was a concern for possible drug use as well." *Id.* This request form was signed electronically by Heather Ungeheuer, APRN, on behalf of Dr. Corbier on May 1, 2017. *Id.* Dr. Corbier testified that the request for the brain MRI was requested to occur within "7–10 days" based on a "clinical judgment" from the reports made by the on-site providers and if certain things "changed," staff could have rushed Mr. Davis for admission to the hospital. Doc. 209-19 at 153–54 (Corbier Dep. 153:18–154:13).

On April 6, 2017, Dr. Corbier approved a request for Mr. Davis to receive an outpatient MRI of his brain. Doc. 209-11 at 29. That same day, Nurse Helus documented that approval. Doc. 201-2 at 66. The appointment was scheduled for April 21, 2017. *Id.* From April 6 to 10, nurses continued to care for Mr. Davis in the infirmary. *Id.* at 8–65. They documented various symptoms including that Mr. Davis was incontinent, continuing to urinate in the water pitchers, having speech issues including mumbling, slurring, and talking nonsense, having trouble walking, and complaining of dizziness. *Id.*

On April 8, Registered Nurse Karen Dennis documented infirmary rounds and noted that Mr. Davis was urinating on himself in his bed. *Id.* at 41–42. She noted that if Mr. Davis "can't manage the urinal or get up to urinate we can always put adult diapers on him to keep his bed dry." *Id.* at 41. Also, she noted that Mr. Davis was "content to lay in wet linens, without telling [nursing staff] he needed to be changed." *Id.* She wrote: "This is not an ordinary mindset for a 27 year old man, to allow himself to lay in urine soaked bed, to be content to live in urine odor room, to dump his urine in a cup (yes, he did it again)." *Id.* at 41–42. Also, she noted that Mr. Davis was showing "very little initiative in self care" and "very little interest in keeping his strength up by eating (I don't like the food) or getting himself out of bed." *Id.* at 42. She expressed concern that if Mr. Davis was diagnosed "with a major muscular dx like MS or other

lifelong condition[,]" she was "afraid he will not fight it or do what he can do to improve his life, he will just allow himself to succ[u]mb to the disease." *Id.*  Nurse Dennis documented a plan to "ask for HCP to give us the OK to get him out of his cell to start walking if they think it is prudent." *Id.*

On April 10, 2017, Nurse Helus noted that Mr. Davis's MRI appointment was rescheduled to April 11, 2017. *Id.* at 7.  On April 11, 2017, Mr. Davis went to an outside provider for his MRI. *Id.* at 6.  He returned to Hutchinson Correctional Facility at 11:58 am. *Id.* Nurse Helus documented this note about the MRI:  "Results of MRI scanned to RMD Dr. Corbier, as well as Dr. [Mohiuddin] and Monir, and Ciskey for review." *Id.*  Also, she noted, "[p]er Dr. Corbier HCP is to call Neurologist @ Cotton O'Neil, Dr. Johnson Haung or Dr. Swanson" and "HCP Ciskey notified to call Neuro today." *Id.*  Nurse Helus never received any instruction from Dr. Corbier to have Mr. Davis taken to the hospital on an emergent basis.  Doc. 209-18 at 34 (Helus Dep. 34:6–18).  Dr. Corbier testified that the MRI results "did require attention" but were not "emergent necessarily."  Doc. 209-19 at 155–56 (Corbier Dep. 155:19–156:12).

### Mr. Davis Found Non-Responsive and Sent to the Hospital

After receiving the MRI, Mr. Davis returned to the infirmary.  Doc. 201-2 at 4–5. Around 12:30 p.m., nursing staff found Mr. Davis unresponsive. *Id.* at 5.  Staff began cardiopulmonary resuscitation (CPR) and called emergency medical services (EMS). *Id.*  When EMS arrived at Hutchinson Correctional Facility, they took over CPR, performed CPR for another 30 minutes, and obtained a heart rate. *Id.* at 1.  EMS transported Mr. Davis to the hospital about 1:30 p.m. *Id.*; *see also* Doc. 209-11 at 41.  And, staff notified Dr. Corbier of what had occurred.  Doc. 201-2 at 1; Doc. 209-11 at 41.

29

On April 13, 2017, Mr. Davis was declared brain dead at Hutchinson Regional Medical Center.  Doc. 187-18 at 17.  The hospital withdrew life support, and Mr. Davis died later that day.  *Id.*; *see also* Doc. 196 at 3 (Pretrial Order ¶ 2.a.5.) (stipulating to the fact that Mr. Davis died on April 13, 2017).

Dr. Fred Tanzer prepared a discharge summary.  Doc. 187-18 at 17; Doc. 209-11 at 43.  The summary stated, "[t]he patient had a CT of the head yesterday [April 12] which showed severe diffuse cerebral edema, tonsillar herniation as noted, and the patient had a cerebral blood flow study this afternoon with findings consistent with brain death."  Doc. 187-18 at 17.  The summary also stated, "I have spoken with the physician from the jail, Dr. Paul Corbier, and he has instructed me it is okay for us to withdraw care when we feel appropriate."  *Id.*

### Mr. Davis's MRI Results

At 12:48 p.m. on April 11, 2017, an outside radiologist reviewed Mr. Davis's MRI.  Doc. 187-18 at 2.  The results noted that there was "evidence of meningeal enhancement that is primarily around the cerebellum and brainstem."  *Id.*  The results also noted:  "The main differential for these findings is an infection.  A demyelinating disorder or an inflammatory condition are also possibilities."  *Id.*  And, it noted there was "[n]o evidence of brainstem compression" and some of the findings were "consistent with a Chiari I malformation."  *Id.* at 3.

The radiologist never called Dr. Corbier "as they sometimes do" to report critical findings.  Doc. 209-19 at 156–157 (Corbier Dep. 156:20–157:8).  According to Dr. Corbier, the radiologist report "communicated a differential diagnosis of possible infection, inflammatory condition, or demyelinating disorders such as multiple sclerosis."  Doc. 187-5 at 4 (Corbier Aff. ¶ 12); Doc. 187-18 at 2.  Dr. Corbier testified that the report from the outside radiologist showed some abnormalities that "did require attention" but he did not view them as "emergent[.]"  Doc.

187-4 at 5 (Corbier Dep. 156:5–12).  After receiving the MRI results, Dr. Corbier instructed staff "to make attempts to find another neurology clinic that would agree to see Mr. Davis sooner than the consultation date scheduled previously."  Doc. 187-5 at 4 (Corbier Aff. ¶ 12).  Mr. Davis never received the consultation before his death.  *Id.*

### Mr. Davis's Cause of Death

On April 14, 2017, an autopsy was performed on Mr. Davis.  Doc. 201-8 at 1 (Autopsy Report).  The coroner determined Mr. Davis's cause of death was granulomatous meningoencephalitis and the manner of death was "natural."  *Id.*  The autopsy report documented that a swab from Mr. Davis's brain "grew a small amount of Candida albicans."  *Id.* at 6.

The diagnosis of granulomatous meningoencephalitis was made on post-mortem autopsy. Doc. 187-5 at 4 (Corbier Aff. ¶ 13).  This diagnosis never was made clinically while Mr. Davis was in the hospital.  *Id.*  Granulomatous meningoencephalitis is a rare condition almost never seen in humans.  *Id.*  Most primary care physicians will not encounter this illness in their entire careers.  Doc. 187-24 at 1 (Phillips Expert Report).

Even more rare is a meningitis caused by Candida Albicans.  Doc. 187-25 at 5 (McKinsey Expert Report).  Dr. Corbier's expert—Dr. Davis S. McKinsey—opines that this "infection is hardly ever seen in contemporary medical practice."  *Id.*  In his more than 35 years as an infectious disease specialist, Dr. McKinsey never has seen a case of Candida albicans meningitis.  *Id.*  Dr. McKinsey attends "monthly conferences of the Kansas City Infectious Diseases Society, at which regional infectious disease experts present the most unusual and challenging cases[,]" and "[n]ot once has a case of Candida meningitis been presented during the decades [he has] been attending these meetings."  *Id.*

When Dr. Corbier participated in the utilization management meeting discussing Mr.

Davis's care, he never had experienced or heard of another case of granulomatous

meningoencephalitis in his decades of medical practice.  Doc. 187-5 at 4 (Corbier Aff. ¶ 13).

### Plaintiffs' Experts

Plaintiffs designated three expert witnesses in this case and produced their expert reports.

Doc. 201-9.  Plaintiffs' three expert witnesses are (1) Lara B. Strick, M.D., (2) Richard Berg,

M.D., and (3) Gail Normadin-Carpio, RN.  *Id.*

### Dr. Strick's Opinions

Lara Strick is a licensed physician in the State of Washington and is Board Certified in

Internal Medicine and Infectious Diseases.  Doc. 209-10 at 3.  Since 2004, she has worked in the

correctional setting, and in 2007, she became the statewide Infectious Disease Physician for the

Washington State Department of Corrections.  *Id.*

Dr. Strick opines[3] that Hutchinson Correctional Facility failed to maintain an adequate

staff during Mr. Davis's incarceration, which led to an inadequate level of care.  *Id.* at 5.

Specifically, she opines:

---

[3]         In response to most of plaintiffs' statements of fact about the contents of Dr. Strick's expert
report, defendants lodge "objections."  *See* Doc. 226 at 40–44; Doc. 227 at 40–45.  Defendants concede
that plaintiffs' factual statements correctly recite the contents of Dr. Strick's report.  But, they argue, her
opinions lack foundation because other evidence in the summary record contradicts her opinions.  For
example, defendants object to one of plaintiffs' statements of fact, arguing that Dr. Strick's opinion is
unfounded because she never reviewed any staffing documents or any documents addressing the health
needs of the population at the Hutchinson Correctional Facility.  Doc. 226 at 39; Doc. 227 at 40.  But, Dr.
Strick's expert report lists the records that she reviewed in reaching her opinions.  Doc. 209-10 at 3, 5
(listing medical records, autopsy report, certificate of death, and 22 deposition transcripts).  And, indeed,
several of the deposition transcripts that Dr. Strick reviewed include testimony about Corizon's staffing
and other policies.  Dr. Strick has provided proper foundation for her opinions.  And notably, defendants
haven't explained or demonstrated that that the experts fail to meet the standard required by Fed. R. Evid.
702 or the requirements articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993).  Instead, all of defendants' "objections" go to the weight a trier of fact should assign
to Dr. Strick's expert opinions.  But, the court, a summary judgment, cannot weigh the evidence.  *See*
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's
function is not himself to weigh the evidence and determine the truth of the matter but to determine

> Hutchinson Correctional Facility (HCF) is an almost 1800-bed facility with a 4-bed infirmary.  In 2016–2017, when Mr. Davis was incarcerated at HCF, the facility was short staffed.  There was no stable full time medical physician at the facility. Dr. Mohiuddin and Dr. Saffo filled in as needed, either in-person or via telehealth, to help ARNP Ciskey and ARNP Durant with coverage.  However, a practitioner was not always readily available.

*Id.* at 20.  Dr. Strick believes that the "lack of a medical director at the facility during at least part of this time Mr. Davis was there contributed to the lack of oversight and coordination of care." *Id.*  She asserts that "the depositions of ARNP Ciskey, Dr. Saffo, and Dr. Mohiuddin" confirm that "the practitioners took a team approach" at Hutchinson Correctional Facility, and "no one felt they had ultimate responsibility for the patient."  *Id.*

Also, Dr. Strick opines that "[a]ll the signs" were present that Mr. Davis "had a serious illness involving his brain, and staff saw them, but they did not do anything about them in a timeframe that meets the standard of care and thus failed to provide life saving therapy."  *Id.*  To support this opinion, Dr. Strick notes that, after "[r]eviewing [Mr. Davis's] medical record," the record shows that "from July to December 2016, [Mr. Davis] had at least 30 visits to the clinic for numbness, back pain and difficulty walking" and during "this period of slightly more than 5 months, [Mr. Davis] had a plain film of his back and an EMG, which did not reveal the diagnosis" that eventually caused Mr. Davis's death.  *Id.*  Dr. Strick observes that "a neurology consult was requested in mid-December, [but] it was denied in part because even Dr. Corbier, the Regional Medical Director, recognized that [Mr. Davis] had not had an adequate neurologic and musculoskeletal exam for someone presenting with neurologic symptoms to assess and document the pertinent signs of his illness other than a basic evaluation of his low extremity strength and sensation on a couple of occasions."  *Id.*  Also, Dr. Strick notes, starting at the end

---

whether there is a genuine issue for trial.").  Thus, the court considers uncontroverted plaintiffs' statements of fact that accurately recite the contents and opinions found in Dr. Strick's expert report.

of December 2016, Mr. Davis "began to complain of dizziness and syncope (passing out), symptoms that would point towards a central or brain etiology for [Mr. Davis's] symptoms[.]" *Id.*  Based on those symptoms, Dr. Strick finds it unsurprising that an MRI of Mr. Davis's lumbar spine in mid-January "was not revealing." *Id.*

Dr. Strick also notes that during Mr. Davis's "more than two-week stay in the infirmary (1/27/17–2/14/17), [he] had symptoms of headache, significant tachycardia, and intermittent fevers despite being on prednisone" and "none of these symptoms, however, were addressed." *Id.*  Dr. Strick observes that by "the end of February, [Mr. Davis] was noted to have nystagmus (erratic or involuntary rhythmic eye movements), a very concerning sign of brain pathology in the context of his other symptoms." *Id.*  Dr. Strick notes that, in March 2017, Mr. Davis was admitted to the infirmary where "the medical staff, "continue[d] to visit [him] daily," but they "just monitor[ed] him while his neurologic symptoms continue[d] to progress." *Id.* at 21.  She observes that Mr. Davis's medical records documented "bizarre behaviors" in March 2017, including "inappropriate disrobing, palilalia (repetition of words), nonsensical speech, and auditory hallucinations." *Id.*

Dr. Strick opines that Mr. Davis "died without ever having an adequate neurologic exam." *Id.*  Also, she opines, had Mr. Davis received "an adequate neurologic exam, a neurology consult and/or brain MRI would have been ordered by January 2017," Mr. Davis "would still be alive today." *Id.*  Dr. Strick opines that "[i]f either of these off-site trips were ordered by January, the patient would have been properly diagnosed and appropriate treatment would have been started before his condition became life threatening." *Id.*  She believes the "medical providers failed to recognize a life-threatening medical condition over nine months as a

result of failing to adequately examine and assess" Mr. Davis. *Id.* Instead, she notes, "[u]ltimately the diagnosis of . . . Mr. Davis['s] condition was determined at autopsy." *Id.*

Dr. Strick concedes that "the actual diagnosis of chronic Candidal (fungal) meningitis is a difficult one to make," but she opines that "an adequate neurological exam would have led to the necessary testing and/or consultation to eventually lead to the proper hospital diagnostics." *Id.*

### Dr. Berg's Opinions

Dr. Richard Berg submitted an expert report based on his review of certain records including Mr. Davis's medical records and depositions of witnesses in this case. Doc. 209-10 at 23.[4] He opines that Mr. Davis "likely could have recovered" from his illness "had he been given proper antimicrobial therapy for 14 days before his cardiac arrest." *Id.* at 24. Dr. Berg opines that the diagnosis of Mr. Davis's condition "would have taken no more than two days" and that Mr. Davis "likely would have lived were he transferred to [the] hospital by March 28[.]" *Id.*

### Nurse Gail Normandin-Carpio's Opinions

Gail Normandin-Carpio is an RNCCHP.[5] Doc. 209-10 at 32. Normandin-Carpio submitted an expert report that cites Standards of Care "from the identified authority source National Commission of Correctional HealthCare, Scope, and Standards of Practice Correctional Nursing American Nursing Association[.]" *Id.* at 25. She recites that the Standards of Care are designed "to ensure that deliberate indifference to the serious medical needs of prisoners [which]

---

[4]     As they did with the statements of fact about Dr. Strick's opinions, defendants lodge "objections" to Dr. Berg's opinions based on a purported lack of foundation. Doc. 226 at 45; Doc. 227 at 45–46. Defendants haven't explained or demonstrated that that the experts fail to meet the standard required by Fed. R. Evid. 702 or the requirements of *Daubert*. For the same reasons already discussed in the context of Dr. Strick's opinions, the court considers uncontroverted plaintiffs' statements of fact that accurately recite the contents and opinions found in Dr. Berg's expert report.

[5]     The parties never define this term. It appears to refer to a Registered Nurse who is a Certified Correctional Health Professional. *See* National Commission on Correction Health Care, https://www.ncchc.org/CCHP-RN (last visited Mar. 30, 2022).

constitutes the unnecessary and wanton infliction of pain does not occur." *Id.* (internal quotation marks omitted).

Normandin-Carpio opines that "Corizon by its marketing branding had a magnitude of resources, in theory, a track record of providing medical services, priding itself on multiple auditing tools and safety nets including a robust CQI manual (431 pages) and a company utilization review program." *Id.* at 31. Normandin-Carpio asserts that a review of Mr. Davis's "medical record . . . against practices in [Corizon's] manuals" shows "an apparent failure to adhere to their program or contractual obligation to provide care meeting a community standard or NCCHC standards." *Id.*

Normandin-Carpio describes several Corizon policies about timely diagnosis and appropriate treatment, and then opines "[a]lthough multiple and sophisticated programs existed and were available, [Corizon] failed to meet the standard of care as defined by their contract and risk loss programs." *Id.* She asserts: "Although the standards of care clearly define it is the medical care team responsible for the comprehensive medical care a patient requires[,] it is clear Marques Davis['s] medical record reflects documentation and an established history of patient generating contact and seeking medical services/mental health care" and "consistently request[ing] medical staff intervention spanning months over the course of his incarceration period until the date of his emergency code." *Id.*

Normandin-Carpio identifies "standards of care" that were "not met with regard to the medical care of Marques Davis, in relation to timely diagnosis, proper assessments, proper treatment, outcomes identification, planning, implementation, coordination of care, and consultations in a timely manner, accurate evaluations, care plans updated and appropriate for the patient condition(s)." *Id.* at 32. She opines that "[t]he medical staff had a clear obligation to

advocate for a patient and accepted a status quo care plan which allowed the patient to decompensate until his death accepting he should accept soiling himself, experiencing mental status changes, and lose a quality of life he once had." *Id.* She finds that the "medical record is absent of a solidarity voice which advocated for the delivery of dignified and humane care by the inter-professional team." *Id.* She believes Mr. Davis "often received scolding and lecturing type of communications clearly failing to meet a therapeutic and respectful relationship with the patient (regardless of inmate status or behavior by the patient which was illness generated)." *Id.* And, she opines that the "standard of care failed to be met until the very end of [Mr. Davis's] existence[.]" *Id.*

### Corizon Policies and Procedures and Mr. Davis's Treatment

Corizon staff may contact EMS to transport an inmate with acute emergencies to a local hospital emergency department, and no approval or involvement from the Regional Medical Director is required to do so. Doc. 187-5 at 2 (Corbier Aff. ¶ 4). Indeed, Corizon's 30(b)(6) designee testified that Corizon policies, in an emergency, allow any licensed individual to send an inmate off site or call an ambulance to take an inmate off site for care. Doc. 209-16 at 40–41 (Salke 30(b)(6) Dep. 40:23–41:7). But, in non-emergency situations, the utilization management process guides on-site physicians about when and how to send an inmate for care outside the facility for something that would be considered routine. *Id.* at 42–43 (Salke 30(b)(6) Dep. 42:9–43:3). Dr. Corbier testified that in non-emergent situations, he had the responsibility for conferring authority to send patients to outside facilities for care. Doc. 209-19 at 17 (Corbier Dep. 17:22–25). Also, he testified that when a request for outside care is made, the on-site physician "synthesize[s] the information" about the patient, "triage[s] the facts[,]" and then

"present[s]" the request for offsite care to the Regional Director.  *Id.* at 132–33 (Corbier Dep. 132:19–133:8).

Corizon's Rule 30(b)(6) designee testified that Ralph Salke defined "urgent" or "emergent" care as something that is or "might" be life threatening.  Doc. 209-16 at 40 (Salke 30(b)(6) Dep. 40:4–22).  Also, he testified that the "routine" category includes any procedures that staff could schedule over a period of weeks or months because they were not urgent.  *Id.* Corizon's Rule 30(b)(6) designee also testified that the only cost motivation related to outside services involved KDOC, and not Corizon.  Doc. 209-16 at 68 (Salke 30(b)(6) Dep. 68:1–13).

HSA Lundry testified that nurses use the Nurse Encounter Tool as a guideline to follow their assessments, and, at the end of the assessments, the guideline will give options for treatment like giving Tylenol, ibuprofen, or Milk of Magnesia, depending on the complaint.  Doc. 209-15 at 33 (Lundry Dep. 33:12–19); *see also* Doc. 209-16 at 62–63 (Salke 30(b)(6) Dep. 62:20–63:1) ("A nursing encounter tool is a guideline for nurses to use when they do their nurse sick call to assist them in triaging, to assist them possibly in urgent or emergent situations[,]" and also is used to "make some recommendations regarding possible diagnostic testing and/or over-the-counter medications.").  The Nurse Encounter Tool is a Corizon publication that HSA Lundry received.  Doc. 209-15 at 34 (Lundry Dep. 34:6–14).  It is distributed to all nurses.  *Id.*  The Nurse Encounter Tool "provided what could be authorized . . . or issued or done by the nurse[.]" *Id.* at 35 (Lundry Dep. 35:10–14).  None of the Nurse Encounter Tools covered neurological weakness and tingling in the extremities.  *Id.* at 111 (Lundry Dep. 111:12–21).  A utilization management nurse can exercise medical discretion when making appointments.  *Id.* at 54–55 (Lundry Dep. 54:20:55–3).  For instance, if the nurse wanted to schedule an appointment for sooner, they could put an inmate on a waiting list, or a call-back list in case of cancellations.  *Id.*

But, nurses at the Hutchinson Correctional Facility were not "in charge of trying to make [a] diagnosis of a patient's problem."  Doc. 209-12 at 12 (Dickerson Dep. 12:20–25).

HSA Lundry testified that staff held weekly care management meetings on Wednesdays. Doc. 209-15 at 62, 63 (Lundry Dep. 62:12–18, 63:14–22).  Dr. Corbier "typically" did not participate in these weekly meetings.  *Id.* at 63 (Lundry Dep. 63:2–6).  HSA Lundry testified that she "think[s]" staff discussed Mr. Davis at weekly care management meetings as early as September of 2016 until his death in April of 2017.  *Id.* at 59 (Lundry Dep. 59:3–13).  HSA Lundry testified that when medical staff convened the multidisciplinary meeting on March 31, 2017, she "didn't feel like [they] had a specific plan of care in place."  *Id.* at 115 (Lundry Dep. 115:11–22).

Corizon did not provide an infectious disease doctor on-site on a monthly basis.  *Id.* at 77–78 (Lundry Dep. 77:23–78:6); *see also* Doc. 209-16 at 29–30 (Salke 30(b)(6) Dep. 29:22–30:1).  But, Corizon's Rule 30(b)(6) designee testified that Corizon's contract with KDOC did not require an on-site infectious disease specialist as part of the "staffing plan" and so "there were not any penalties" for not having one on-site.  Doc. 209-16 at 62 (Salke 30(b)(6) Dep. 62:9–14).  Mr. Davis never saw an on-site infectious disease doctor, and no one ever recommended that he see one.  Doc. 209-15 at 78 (Lundry Dep. 78:7–9).  HSA Lundry testified that no one ever recommended for Mr. Davis to "go offsite for any other type of assessment by a neurologist to determine what type of test might be felt by the neurologist to be important for Mr. Davis."  *Id.* at 78 (Lundry Dep. 78:18–23).

Dr. Corbier testified that he knew—during the times relevant to this lawsuit (August 2016 to April 2017)—that KDOC was penalizing Corizon for inadequate staffing but he doesn't recall

the details of the discussions about penalties and his focus was on the clinical side of maintaining professional staffing.  Doc. 209-19 at 92–95 (Corbier Dep. 92:15–95:8).

### *Observations by Other Inmates*

Alcena Dawson, Jr. is an inmate who worked in the clinic at Corizon as a Porter.  Doc. 209-13 at 7 (Dawson Dep. 7:13–19).  Mr. Dawson testified that he saw Mr. Davis about three weeks before his death and it was "almost like [he] couldn't understand him."  *Id.* at 14–15 (Dawson Dep. 14:19–22, 15:12–14).  Mr. Dawson testified that, while Mr. Davis was in the isolation cell, he would use the bathroom on himself (urine and feces), and it was Mr. Dawson's job to clean it up.  *Id.* at 21 (Dawson Dep. 21:7–25).  Mr. Dawson witnessed Mr. Davis urinate into a urine container, and he saw him drink out of the urinal about three or four times.  *Id.* at 24–25 (Dawson Dep. 24:10–25:2).  Mr. Dawson testified that he told a staff member—maybe named Barb—that Mr. Davis was drinking out of his urinal, but no one said anything to him after he made the report.  *Id.* at 53 (Dawson Dep. 53:12–22).

Mr. Dawson testified that around the last week of Mr. Davis's life, Mr. Davis "wasn't really able to speak anymore" and a "couple of times" when Mr. Dawson asked how he was doing, Mr. Davis "just looked at [him] like he didn't even know" him.  *Id.* at 28–29 (Dawson Dep. 28:16–29:6).  Mr. Dawson thinks it was in March when Mr. Davis began to have trouble carrying on a conversation.  *Id.* at 35 (Dawson Dep. 35:10–18).

Marquel Dean is an inmate at Hutchinson Correctional Facility who has known Mr. Davis since childhood.  Doc. 209-14 at 6 (Dean Dep. 6:3–17).  Mr. Dean testified that he observed Mr. Davis having symptoms that started with "numbness in his leg to eventually messing with his memory."  *Id.* at 8 (Dean Dep. 8:4–10).  Mr. Dean testified that he observed Mr. Davis fall on a couple of occasions and, starting about two months before Mr. Davis passed

away, he assisted Mr. Davis with his walking on several occasions.  *Id.* at 10–11 (Dean Dep. 10:22–11:11).

D-Wayne Gooch is an inmate at Hutchinson Correctional Facility.  Doc. 209-17 at 5 (Gooch Dep. 5:14–16).  He testified that he worked in the clinic and observed Mr. Davis "having trouble walking" and that he was "using the bathroom on himself[.]"  *Id.* at 6, 8 (Gooch Dep. 6:1, 8:2–19).  He also testified that he personally observed Mr. Davis drinking his own urine.  *Id.* at 8 (Gooch Dep. 8:2–19).

### III.    Summary Judgment Standard

The standard for deciding summary judgment under Federal Rule of Civil Procedure 56 is well-known.  Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]"  *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]"  *Celotex*, 477 U.S. at 323.  A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250

(citation and internal quotation marks omitted).  To satisfy this requirement, the nonmoving

party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers

to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial." *Celotex*, 477 U.S. at 324 (citation and internal quotation marks omitted).  When

deciding whether the parties have shouldered their summary judgment burdens, "the judge's

function is not . . . to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Summary judgment is not a "disfavored procedural shortcut[.]" *Celotex*, 477 U.S. at 327.

Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive

determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## IV.    Analysis

Plaintiffs bring this lawsuit against defendants Corizon and Dr. Corbier, asserting:  (1) 42

U.S.C. § 1983 claims, alleging violations of the Eighth Amendment for deliberate indifference to

a serious medical need, failing to provide medical care and treatment, and failing to supervise,

direct, and control; (2) wrongful death claims under Kansas law; and (3) negligence claims under

Kansas law.  Doc. 196 at 12–22 (Pretrial Order ¶ 4.a.).  The court addresses each of the three

claims, in turn, below.

### A.  Section 1983 Claims

Plaintiffs assert § 1983 claims against both defendants.  The standard governing § 1983

claims differs for claims asserted against an individual, like Dr. Corbier, and claims asserted

against a private entity, like Corizon.  So, the court addresses the § 1983 claims separately.  The

court begins with Dr. Corbier's summary judgment arguments against plaintiffs' § 1983 claims.

### 1. Dr. Corbier

Dr. Corbier asserts he is entitled to summary judgment against plaintiffs' § 1983 claims for three reasons.

### a. Deliberate Indifference

*First*, Dr. Corbier argues that the summary judgment facts present no genuine issue whether Dr. Corbier violated Mr. Davis's Eighth Amendment rights. The Supreme Court has recognized "that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation and internal quotation marks omitted); *see also Prince v. Sheriff of Carter Cnty.*, __ F.4th __, No. 20-7056, 2022 WL 763416, at *5 (10th Cir. Mar. 14, 2022). Thus, Dr. Corbier is entitled to summary judgment if the undisputed facts present no triable issue whether Dr. Corbier was deliberately indifferent to Mr. Davis's serious medical needs.

The "deliberate indifference" test involves "'both an objective and a subjective component.'" *Requena v. Roberts*, 893 F.3d 1195, 1215 (10th Cir. 2018) (quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)); *see also Prince*, 2022 WL 763416, at *6 ("In considering whether the plaintiff was treated with deliberate indifference, [courts] consider the objective severity of the harm suffered as well as the subjective mental state of the defendant with respect to such harms.")

### i. Objective Component

The objective component requires the plaintiff to allege that the deprivation at issue was sufficiently serious. *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). This standard means that the defendant's actions "must result in the denial of the minimal civilized measure of life's

necessities[.]" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation and internal quotation marks omitted).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Ramos*, 639 F.2d at 575 (citation and internal quotation marks omitted).  "Deliberate indifference toward an inmate's risk of death certainly satisfies this standard." *Prince*, 2022 WL 763416, at *6.

Dr. Corbier doesn't concede "the objective component of the deliberate indifference test" because, he argues, "there is considerable question" about "what conditions afflicted [Mr.] Davis at various points in time." Doc. 187 at 19.  But, Dr. Corbier doesn't seek summary judgment under the objective prong; instead, he addresses only the subjective component because, he argues, it is dispositive of the Eighth Amendment claims. *Id.* at 19–20.  Thus, the court need not address the objective component of the deliberate indifference test.  Nevertheless, the court notes that the summary judgment record presents sufficient facts—viewed in plaintiffs' favor—for a reasonable jury to find that Mr. Davis's symptoms were sufficiently serious that a lay person easily would have recognized his need for medical attention.  The record shows that, throughout an almost nine-month span, Mr. Davis was complaining of back pain, leg pain, numbness, falling, dizziness, fainting, constipation, headaches, and chest pain.  And, in the last month of his life, he continued to report these symptoms while (as nurses documented) exhibiting bizarre behavior.  This behavior included showing staff his buttocks and urinating in his water pitcher, having difficulty walking or standing, and stuttering and slurring his speech.  A reasonable jury certainly could find from these facts that Mr. Davis's symptoms were sufficiently serious to meet the objective prong of the deliberate indifference test.

### ii.   Subjective Component

The subjective prong of the deliberate indifference standard requires the prisoner to allege that the official was deliberately indifferent to a serious medical need. *Farmer*, 511 U.S. at 834. This prong requires that the prison official had a culpable mental state. *Id.* A plaintiff sufficiently alleges a culpable mindset when the facts alleged show that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Prince*, 2022 WL 763416, at *7.

"Whether an official had 'the requisite knowledge of a substantial risk' and ignored that risk is a question of fact." *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 842). Our Circuit has recognized that "it is difficult, if not impossible, to prove another person's actual state of mind," and so, "whether an official had knowledge may be inferred from circumstantial evidence." *Id.* Generally, it's "not enough to establish that the official *should* have known of the risk of harm," but "in some cases 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious[.]'" *Id.* (quoting *Farmer*, 511 U.S. at 842 (further citations and internal quotation marks omitted)).

Here, Dr. Corbier's argument is two-fold. He asserts that the summary judgment record presents no triable issue (1) whether any Corizon medical provider was deliberately indifferent to Mr. Davis's serious medical needs, and (2) whether Dr. Corbier had a subjective understanding of any substantial risk of serious harm to Mr. Davis. Doc. 187 at 20–28. The court disagrees with both arguments.

*First*, the summary judgment record presents a genuine issue whether Corizon medical providers were deliberately indifferent to Mr. Davis's serious medical needs. The summary

judgment facts documenting Mr. Davis's symptoms—viewed in plaintiffs' favor—permit a reasonable jury to conclude that medical staff knew of and disregarded a serious risk of harm to Mr. Davis. The summary judgment facts include reports spanning an almost nine-month period where Mr. Davis complained of pain, numbness, and difficultly walking. In December 2016, Mr. Davis told medical staff that his trouble walking was getting more severe, he complained of dizziness, and he began to have fainting spells. In response to these complaints, medical staff ordered Mr. Davis various lab tests, a lumbar spine MRI, and an EMG. But none of these tests determined the cause of Mr. Davis's symptoms. And, importantly, none of the treatment Mr. Davis was receiving appeared to help his symptoms improve.[6]

Also, the symptoms described by witnesses and documented in the last several weeks of Mr. Davis's life are particularly troubling. And, they provide plenty of circumstantial evidence for a reasonable jury to find that medical staff knew of and disregarded a serious risk of harm to Mr. Davis. Those facts include continued reports and witness statements about Mr. Davis's difficultly walking, and complaints of pain and numbness, with additional and concerning symptoms of bizarre behavior—frequent incontinence, hallucinations, and the slurring and stuttering of his speech. In response to these symptoms, staff continued to monitor Mr. Davis's symptoms, and finally, decided during the March 31 multidisciplinary team meeting to send Mr. Davis for an outside MRI of his brain. Staff initially scheduled that MRI appointment for June 2016, but later, moved the appointment up to April 11. A reasonable jury could find that medical

---

[6]     Dr. Corbier repeatedly argues that Mr. Davis's symptoms were inconsistent. And, indeed, the summary judgment record corroborates Dr. Corbier's position about the facts. Medical reports note times when Mr. Davis reported that he was feeling better and note his ability to perform certain physical activities. But, the court must view the summary judgment facts in plaintiffs' favor. And, in that light, the summary judgment record contains sufficient evidence for a reasonable factfinder to conclude that Mr. Davis's symptoms—beginning in September 2016 and continuing through his death in April 2017— placed medical staff on notice of a serious risk of harm to Mr. Davis's health.

staff's failure to address Mr. Davis's symptoms more quickly and urgently shows that they disregarded a serious risk of harm to Mr. Davis's health. *See Prince*, 2022 WL 763416, at *8 (finding jail employee was deliberately indifferent to inmate's serious medical needs when she was "on notice of the severity of [the prisoner's] symptoms" that included communicating incoherently and fecal incontinence but "made no effort to order that [the prisoner] be transported to a hospital").

Dr. Corbier argues that that summary judgment facts can't show deliberate indifference because medical staff "regularly met in an effort to determine what additional testing might be indicated and necessary." Doc. 187 at 20. But, the record documents just one multidisciplinary team meeting that Dr. Corbier attended where providers met to discuss Mr. Davis's symptoms and treatment plan on March 31, 2017. Otherwise, some witnesses testified that Mr. Davis's symptoms were discussed at weekly meetings, but it's uncontroverted that Dr. Corbier typically didn't attend those meetings. And, the record fails to show that any definitive treatment plan ever resulted from those weekly meetings other than just continued monitoring of Mr. Davis's symptoms. Indeed, HSA Lundry testified that when medical staff finally convened the March 31, 2017 multidisciplinary meeting, she "didn't feel like [they] had a specific plan of care in place" for Mr. Davis's care. Doc. 209-15 at 115 (Lundry Dep. 115:11–22). Also, a reasonable jury could find that Mr. Davis's providers had no definitive treatment plan since he continued to complain about his symptoms for almost a nine-month period with no diagnosis occurring until after his death.

Dr. Corbier next relies on the one-page report signed by Dr. Margaret Smith to argue that medical staff had no subjective understanding of a risk to serious harm when an outside and independent consultant concluded that Mr. Davis had "an extensive and thorough evaluation"

and didn't identify any additional testing that Corizon medical staff had failed to perform.  Doc. 187-6 at 1.  A reasonable jury might reach that conclusion based on the one-page report signed by Dr. Smith.  But, a reasonable jury also might draw a different conclusion in light of the limited contents of the report and the other evidence in the summary judgment record.  Dr. Smith's report is one page, it recites that "clinical staff" reviewed the case based on a concern raised by Mr. Davis's mother "that he might have multiple sclerosis[,]" and it doesn't identify the information clinical staff reviewed to reach that conclusion.  Doc. 187-6.  A reasonable jury could conclude that a review of Mr. Davis's case based only on concerns about multiple sclerosis wasn't a sufficient review of his entire medical profile to find that Mr. Davis faced no risk of serious of harm.  Also, the report specifically suggests another test and recites that other practitioners might not find it necessary in "the absence of any major neurologic abnormalities[.]"  *Id.*  The report doesn't define what kind of "neurologic abnormalities" would support such additional testing, but a reasonable jury could conclude from the summary judgment facts that Mr. Davis was exhibiting neurologic abnormalities—*i.e.*, bizarre behavior, hallucinations, trouble speaking—and those symptoms sufficed to give medical staff a subjective understanding that Mr. Davis had a serious medical need that required more than the medical attention they were providing.

Dr. Corbier also asserts that the summary judgment facts, at most, might support a finding that the medical providers misdiagnosed Mr. Davis's condition.  But, Dr. Corbier argues, "a misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim."  *Self v. Crum*, 439 F.3d 1227, 1234 (10th Cir. 2006).  For support, he cites cases where courts have found no subjective deliberate indifference when a medical provider mistakenly diagnosed and

treated a particular condition based on the patient's symptoms but the patient later was diagnosed (correctly) with another condition. *See Estelle*, 429 U.S. at 107 (holding that prisoner failed to state a § 1983 claim against a medical director when prisoner "was seen by medical personnel on 17 occasions spanning a 3-month period" who "diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers[,]" and although medical providers didn't order additional diagnostic testing as part of the prisoner's treatment, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment" but "[a]t most it is medical malpractice"); *see also Spencer v. Abbott*, 731 F. App'x 731, 742–45 (10th Cir. 2017) (holding a physician's assistant was not deliberately indifferent to a prisoner's medical needs where he misdiagnosed that the prisoner was having a stroke and instead diagnosed a muscle spasm because prisoner "visually presented . . . with a prominent spasm in his left trapezius muscle" and had "immediate relief" when the physician's assistant massaged the muscle and "affirmatively acted to address [the prisoner's symptoms] by prescribing a muscle relaxant and physical therapy"); *Childress v. Harms*, 449 F. App'x 758, 761–62 (10th Cir. 2011) (holding that prisoner failed to establish the subjective component of a deliberate indifference claim where prisoner suffered a stroke, arrived at the jail with symptoms consistent with intoxication, and a nurse ruled out likelihood of a stroke based on a medical evaluation because the question whether the nurse should have done more to diagnose a stroke was a "question of negligence" and the prisoner was "not denied care, but rather, was regularly monitored and examined before being taken to the hospital—all of which occurred within a roughly six-hour period"); *Self*, 439 F.3d at 1234 (affirming summary judgment against Eighth Amendment claim where prisoner's symptoms "were consistent with a variety of conditions, including respiratory infection[,]" prisoner received treatment for the diagnosed respiratory

condition, but later was diagnosed with a heart condition because the "mere possibility that [a prisoner's] symptoms could also point to other conditions" is "not sufficient to create an inference of deliberate indifference").

Dr. Corbier's cited cases differ from Mr. Davis's case in one important respect:  there was no misdiagnosis of Mr. Davis's symptoms.  Instead, there was *no* diagnosis of his symptoms.  For almost nine months, medical staff knew about his symptoms ranging from headaches to leg pain to dizziness, and they couldn't determine their root cause.  To be sure, staff provided Mr. Davis treatment in the form of assessments, observations, and Tylenol.  Also, they ordered various tests to try to determine the cause of Mr. Davis's symptoms.  But, none of those tests produced a diagnosis.  Indeed, Dr. Corbier's briefing doesn't identify the "mistaken" diagnosis.  Instead, he concedes that "there seemed to be no explanation for his symptoms." Doc. 187 at 20.  Mr. Davis's medical records document various diagnoses that Mr. Davis received through the nine-month period from muscle pain to dehydration, and they contemplate other potential diagnoses ranging from lipoma to cognitive diseases like lupus and multiple sclerosis.  But, the record establishes that medical staff never produced a diagnosis for Mr. Davis's symptoms and, to the time of his death, medical staff still was trying to determine the cause of his symptoms.

Indeed, the summary judgment facts viewed in plaintiffs' favor show that Mr. Davis's symptoms continued to progress in severity and that medical staff's treatment of his progressively deteriorating symptoms wasn't producing any diagnosis.  Our Circuit recently reiterated that "'[i]f a prison doctor . . . responds to an obvious risk with treatment that is patently unreasonable, a jury may infer conscious disregard.'" *Reneau v. Cardinas*, 852 F. App'x 311, 317 (10th Cir. 2021) (quoting *Self*, 439 F.3d at 1232).  This type of claim is "'actionable only in

cases where the need for additional treatment or referral to a medical specialist is obvious,' such as when a medical professional (1) 'recognizes an inability to treat the patient due to the seriousness of the condition and his corresponding lack of expertise but nevertheless declines or unnecessarily delays referral'; (2) 'fails to treat a medical condition so obvious that even a layman would recognize the condition'; or (3) 'completely denies care although presented with recognizable symptoms which potentially create a medical emergency.'" *Id.* (quoting *Self*, 439 F.3d at 1232). A reasonable jury could infer as much here—that medical staff recognized that they were unable to treat the patient (indeed, Mr. Davis's medical records support that fact)—and that they unnecessarily delayed referral for a neurology consultation that included imaging of the brain until April 2016—many months after Mr. Davis began complaining of symptoms and several weeks after his symptoms escalated to include bizarre and incoherent behaviors.

Our Circuit has found that similar facts—*i.e.*, ones involving a prisoner's medical condition that grew progressively worse over time while under the care of medical providers—can satisfy the subject component of the deliberate indifference test. *See Oxendine v. Kaplan*, 241 F.3d 1272, 1278–79 (10th Cir. 2001) (holding subjective prong met where inmate alleged that he repeatedly had told physician that his finger "had turned jet black" and that he was "in considerable pain due to the decaying skin tissue" but physician didn't seek the "specialized medical assistance" the inmate required for more than a week); *see also Est. of Booker v. Gomez*, 745 F.3d 405, 431–32 (10th Cir. 2014) (holding subjective component met where defendants "had a front-row seat to [the inmate's] rapid deterioration" and in "light of [their] training and [the inmate's] limp appearance, a reasonable jury could conclude the [d]efendants inferred that [the inmate] was unconscious and needed immediate medical attention" and noting if "a jury

concludes the [d]efendants made this inference, then it could also conclude they were deliberately indifferent in failing to respond sooner").

Also, Dr. Corbier asserts that medical providers weren't deliberately indifferent to Mr. Davis's medical needs by citing the tests and outside consultations that he did receive—*i.e.*, the imaging, labs, EMG.  But, none of these tests identified the cause of Mr. Davis's symptoms.  And, it's undisputed that Mr. Davis never received a brain MRI—the test that finally identified abnormalities—until two days before he died.  According to plaintiffs' expert Dr. Strick, Mr. Davis "died without ever having an adequate neurologic exam."  Doc. 209-10 at 21.  She opines that "[a]ll the signs were there" for medical staff to know Mr. Davis had a serious illness involving his brain.  *Id.* at 20.  But, she believes the "medical providers failed to recognize a life threatening medical condition over nine months as a result of failing to adequately examine and assess" Mr. Davis.  *Id.* at 21.  And, she opines that had Mr. Davis received "an adequate neurologic exam, a neurology consult and/or brain MRI" by "January 2017," Mr. Davis "would still be alive today."  *Id.*  As already noted, defendants object to Dr. Strick's opinions for various reasons, but they don't argue or show that her opinions amount to unreliable admissible evidence.  A jury might decline to accredit Dr. Strick's opinions based on defendants' arguments against them.  But, a reasonable jury could accredit Dr. Strick's opinions and infer that Mr. Davis's medical providers were deliberately indifferent to Mr. Davis's serious medical needs.  Dr. Strick's opinions present a question for the jury that the court can't decide on summary judgment.

Dr. Corbier also stresses the rarity of the disease that Mr. Davis's autopsy eventually identified as the cause of his death.  Based on the rare and unique circumstances presented by Mr. Davis's illness, Dr. Corbier argues it's "not surprising" that medical providers were unable

to diagnose his condition before his death.  Doc. 187 at 24.  But, Dr. Strick has a competing

opinion on that topic.  She recognizes that "the actual diagnosis of chronic Candidal (fungal)

meningitis is a difficult [diagnosis] to make[.]"  Doc. 209-10 at 21.  But, she opines that "an

adequate neurological exam would have led to the necessary testing and/or consultation to

eventually lead to the proper hospital diagnostics."  *Id.*  If a jury were to credit Dr. Strick's

opinion, it could find medical staff deliberately indifferent to Mr. Davis's serious medical needs

even though the disease that caused his death was exceedingly rare.

In sum, the question whether medical staff were deliberately indifferent to Mr. Davis's

medical needs is a fact question that the jury must decide.

*Second*, the summary judgment facts—viewed in plaintiffs' favor—permit a reasonable

fact finder to conclude that Dr. Corbier—himself—violated Mr. Davis's Eighth Amendment

rights because he knew of substantial risk of harm to Mr. Davis and ignored that risk.  The Tenth

Circuit has explained that if a "medical professional knows that his role in a particular medical

emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the

condition, and if he delays or refuses to fulfill that gatekeeper role due to deliberate indifference,

it stands to reason that he also may be liable for deliberate indifference from denying access to

medical care."  *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).  Here, it's

undisputed that Dr. Corbier, as Corizon's Regional Medical Director, was responsible for the

oversight of clinical activities.  Doc. 187-5 at 1 (Corbier Aff. ¶¶ 1–2).  Also, it's undisputed that

Dr. Corbier didn't provide direct care to Mr. Davis.  *Id.* at 2 (Corbier Aff. ¶ 5).  Instead, Dr.

Corbier describes his participation in Mr. Davis's case as "limited to approving and disapproving

requests" made by Mr. Davis's treating providers.  Doc. 227 at 92.  Dr. Corbier argues that he

didn't fail to fulfill his gatekeeper role for several reasons.  But, none of those arguments entitle him to summary judgment on the subjective component of the deliberate indifference test.

Dr. Corbier contends that the summary judgment record includes no evidence showing he knew of a substantial risk of harm to Mr. Davis because none of the reports he received from Mr. Davis's medical providers identified an "emergency" medical condition.  Instead, Dr. Corbier cites medical requests he received from Mr. Davis's providers noting that Mr. Davis was experiencing "routine" muscle weakness or "mild" symptoms.  But, even if the information Dr. Corbier received never identified an "emergency," a reasonable factfinder could conclude from the facts in the summary judgment record that Dr. Corbier knew of a serious risk of harm to Mr. Davis based on the reports he received over a six-month period about Mr. Davis's continued symptoms that—viewing the evidence in plaintiffs' favor—never improved (and for some symptoms worsened in frequency and severity).[7]

Also, the record isn't clear about what exactly the medical providers discussed at the March 31, 2017 multidisciplinary meeting.  So, there's no evidence documenting precisely the information Dr. Corbier received about Mr. Davis's symptoms while participating in that meeting by telephone.  But, on that date, Mr. Davis had been in the infirmary for almost a week after he was admitted because he had passed out.  Doc. 201-3 at 80–90.  And, during his time in the infirmary, nursing staff noted changes in Mr. Davis's behavior and documented that he was urinating in his water pitcher, having difficulty walking or standing, acting inappropriately with

---

[7]     Dr. Corbier also asserts that the "independent review" signed by Dr. Smith is "*dispositive* evidence that Dr. Corbier could not have possessed a subjective understanding that the patient was at a substantial risk of serious harm."  Doc. 227 at 95.  For reasons already explained, Dr. Smith's one-page report isn't dispositive.  A reasonable jury could conclude that the report focused only on the concern about multiple sclerosis, and in light of the other summary judgment evidence—particularly the medical records documenting Mr. Davis's continued symptoms over many months—the one-page report wasn't sufficient to give Dr. Corbier a subjective understanding that no serious harm existed.

nursing staff including by showing staff his buttocks, and stuttering and slurring his speech. Doc. 201-3 at 19, 30, 36, 41–42, 53, 69, 73, 80, 84–85; Doc. 201-4 at 2.  A reasonable jury could infer that Dr. Corbier learned some of this information in a meeting that was scheduled specifically to discuss Mr. Davis's plan of care.  Thus, he knew about the serious risks to Mr. Davis's health.  And, while providers agreed at the meeting to send Mr. Davis to an outside provider for a brain MRI, that appointment initially was scheduled for June.  The meeting didn't result in any more urgent testing or treatment for Mr. Davis's symptoms which—viewed in plaintiffs' favor—were growing increasingly more severe based on observations that nurses documented.  From these facts, a reasonable jury could find or infer that Dr. Corbier failed to fulfill his gatekeeper role.

Also, the summary judgment facts show, in October 2016, Dr. Corbier first received notice of Mr. Davis's symptoms when Dr. Saffo reported that Mr. Davis was experiencing leg and muscle weakness and walking with an obvious limp.  Doc. 209-11 at 3.  Dr. Saffo also requested that Mr. Davis receive an EMG of his lower extremities.  *Id.*  While Dr. Corbier approved that request, *id.* at 5, the EMG returned "normal" results, Doc. 201-5 at 17.  For the next six months, Dr. Corbier received many more reports about Mr. Davis that continued to document weakness in his lower extremities, trouble walking, and numbness.  Doc. 209-11 at 9, 27–28; *see also* Doc. 201-4 at 79–80, 86–87.  A reasonable jury could conclude from these facts that Dr. Corbier knew of a serious risk to Mr. Davis because he continued to experience these symptoms with no improvement and no diagnosis for the condition.

Dr. Corbier also argues that he wasn't deliberately indifferent to Mr. Davis's serious medical needs because he approved several tests for him—*i.e.*, the EMG, an MRI of his lumbar spine, and eventually, the approval of the brain MRI in April 2017.  Based on these facts, a

reasonable jury might agree with Dr. Corbier that he didn't disregard any serious risk to Mr. Davis. But, a jury also might find—based on tests Dr. Corbier didn't approve—that he knew of a serious risk of harm to Mr. Davis and disregarded that risk by failing to order additional testing to locate a diagnosis for the symptoms Mr. Davis had experienced for months.

As already noted, medical providers had reported to Dr. Corbier that Mr. Davis was experiencing symptoms consistent with a neurological disorder including muscle weakness, numbness, back pain, and walking with a limp. Doc. 209-11 at 9, 27–28; *see also* Doc. 201-4 at 79–80, 86–87. In December 2017, Dr. Mohiuddin requested an ultrasound on a soft tissue mass on Mr. Davis's lower back. Doc. 201-4 at 87. Dr. Corbier didn't approve this request, despite knowing that Mr. Davis had been experiencing muscle weakness for several months, and instead proposed an alternative treatment plan that included observation of the mass and a "full neurologic/musculoskeletal exam[.]" *Id.* at 86. In February 2017, Dr. Mohiuddin requested a neurological consult for Mr. Davis's lower extremity weakness. *Id.* at 65. Dr. Mohiuddin noted that Mr. Davis still was walking with an "inconsistent limp" and that he continued to have numbness in his toes. *Id.* Dr. Corbier declined to approve the request and instead proposed an alternative treatment plan that included continuing to "monitor neurologic sig[.]" *Id.* at 64. A reasonable jury could find that Dr. Corbier's refusal to order these tests—in light of the symptoms documented and for the duration Mr. Davis had experienced them—amounted to deliberate indifference because Dr. Corbier "delay[ed] or refus[ed] to fulfill [his] gatekeeper role" for other medical personnel to examine and treat Mr. Davis's condition. *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000); *see also Burke v. Regalado*, 935 F.3d 960, 994–95 (10th Cir. 2019) (holding that a reasonable jury could conclude that defendants "failed to

fulfill their gatekeeping role" when inmate complained to them of paralysis and defendants failed to act on a need for obvious medical attention).

Thus, the summary judgment facts—when properly viewed in plaintiffs' favor—present a triable issue whether Dr. Corbier disregarded a serious risk to Mr. Davis's health sufficient to satisfy the subjective component of the deliberately indifferent test.

### b.  Supervisory Liability

*Second*, Dr. Corbier argues that summary judgment is warranted against plaintiffs' § 1983 claims asserted against him in his supervisory capacity.  Although the court finds above that plaintiffs have come forward with sufficient summary judgment evidence to present a triable issue about Dr. Corbier's direct participation in depriving Mr. Davis's constitutional rights to hold him individually liable under § 1983, the court agrees with Dr. Corbier that no genuine issue exists whether Dr. Corbier is liable in his supervisory capacity.

Dr. Corbier argues in his opening summary judgment brief that summary judgment is warranted against plaintiffs' two theories of supervisory liability because (1) Dr. Corbier didn't promulgate or implement a policy or procedure that violated Mr. Davis's constitutional rights, and (2) Dr. Corbier didn't fail to "supervise, direct, and control" medical staff at the Hutchinson Correctional Facility.  Doc. 187 at 29.  Plaintiffs' Opposition to Dr. Corbier's summary judgment motion only addresses the first theory of supervisory liability.  Doc. 209 at 99–103.  Thus, the court finds that plaintiffs have waived any claim for supervisory liability against Dr. Corbier based on an alleged failure to supervise, direct, or control medical staff.  *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768 (10th Cir. 2001) (affirming district court's summary judgment dismissal of plaintiff's claim because plaintiff had "abandoned [the] claim by failing to address it in his response to defendants' motion for summary judgment"); *Loudon v. K.C. Rehab.*

*Hosp., Inc.*, 339 F. Supp. 3d 1231, 1242 (D. Kan. 2018) (holding that plaintiff had abandoned claim by not responding to defendant's summary judgment arguments against the claim).

For plaintiffs' other theory of supervisory liability—that Dr. Corbier implemented a policy or procedure violating Mr. Davis's constitutional rights—plaintiffs correctly assert that a § 1983 claim based on this kind of supervisory liability requires a showing that "'(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'"  Doc. 209 at 99 (quoting *Smith v. Allbaugh*, 987 F.3d 905, 911 (10th Cir. 2021)).  And, plaintiffs argue in conclusory fashion that "the policies approved and implemented by Dr. Corbier resulted in an approach to medical care that discouraged necessary treatment of inmates in order to reduce costs[,]" which, in turn, "resulted in the failure to properly diagnose and treat Mr. Davis."  *Id.* at 100.  To support this argument, plaintiffs identify just two purported policies and procedures.

Plaintiffs first argue that the Nursing Encounter Tool was "used in an effort to make inmates receive care from nurses rather than doctors[.]"  *Id.* at 100.  But, as Dr. Corbier correctly asserts, plaintiffs haven't marshalled any summary judgment evidence for a jury to infer that the Nursing Encounter Tool limited Mr. Davis's care to nurses and prevented him from seeing doctors.  To the contrary, the record shows that Mr. Davis regularly saw physicians for his complaints about muscle weakness, leg pain, headaches, and numbness beginning in September 2016—when he first started complaining of these symptoms—and continuing until his death in April 2017.

Also, Dr. Corbier properly argues that the summary judgment record lacks evidence presenting a triable issue on the third element of a supervisory liability claim—the "state of

mind" requirement.  *Smith*, 987 F.3d at 911.  Our Circuit has explained that a "government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type experienced by the plaintiff."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (citation and internal quotation marks omitted).  Plaintiffs don't cite any summary judgment facts permitting a trier of fact to find or infer that Dr. Corbier was "presented with an obvious risk of constitutional harm" based on any knowledge that the Nursing Encounter Tool was preventing Mr. Davis (or other inmates) from seeing a physician, and thus not receiving adequate medical care.  Again, the summary judgment record shows the opposite.  Dr. Corbier received reports and requests from other physicians— particularly Dr. Saffo and Dr. Mohiuddin—about their observations of Mr. Davis's symptoms.  So, no reasonable jury could find that Dr. Corbier had the requisite state of mind to support a § 1983 claim based on a policy involving the Nursing Encounter Tool.

Plaintiffs next argue Dr. Corbier implemented a policy that was an "overall approach to medicine . . . geared toward reducing costs by reducing outside care."  Doc. 209 at 101.  But to support this theory, plaintiffs offer no more than vague references to policies that encourage Corizon providers to treat inmates on-site and avoid unnecessary trips to outside providers.[8]  But, plaintiffs fail to adduce any evidence in this summary judgment record that a purported policy caused a constitutional violation.  Instead, the summary judgment facts show that Mr. Davis was referred to outside treatment on several occasions.  From outside providers, Mr. Davis received x-rays, an EMG, and MRIs of his lumbar spine and brain.  Although the summary judgment facts

---

[8]     Dr. Corbier controverts plaintiffs' citation to certain Corizon policies asserting that plaintiffs haven't established the requisite foundation for them.  Doc. 227 at 7–20.  The court needn't decide that dispute because even if plaintiffs provide proper foundation, they haven't presented a triable issue that any Corizon policy caused a constitutional violation.

present a triable issue whether the medical providers were deliberately indifferent to Mr. Davis's serious medical needs—indeed, a reasonable jury could infer as much from the disconnect between the obvious symptoms Mr. Davis was experiencing and the care that he received— plaintiffs fail to present a triable issue that a Corizon *policy* caused a violation of Mr. Davis's Eighth Amendment rights.  In sum, plaintiffs haven't shouldered their summary judgment burden to come forward with admissible evidence identifying an issue for trial whether Dr. Corbier is liable under § 1983 in a supervisory capacity for implementing an unconstitutional policy or procedure.  The court thus grants summary judgment for Dr. Corbier on plaintiffs' § 1983 claims asserted against him in a supervisor capacity.

### c.  Qualified Immunity

*Finally*, Dr. Corbier asserts that the qualified immunity doctrine shields him from § 1983 liability.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To establish a § 1983 claim against an individual defendant who asserts the defense of qualified immunity, plaintiffs must (1) come forward with facts that "make out a violation of a constitutional right[,]" and (2) demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.* at 232.

But, as the Supreme Court has explained, "private actors are not *automatically* immune" from suit in a § 1983 case.  *Richardson v. McKnight*, 521 U.S. 399, 412 (1997).  Instead, the qualified immunity doctrine applies to private actors if the qualified immunity defense:  (1) "is 'supported by historical practice[,]'" or (2) "'based on public policy considerations.'"  *Tanner v.*

*McMurray*, 989 F.3d 860, 867 (10th Cir. 2021) (quoting *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1166 (10th Cir. 2005)).  Just last year, our Circuit held that "neither 19th century common law nor modern policy considerations support allowing private medical professionals who are employees of a contractor that provides healthcare in jails or prisons to avail themselves of qualified immunity."  *Id.* at 870.

Dr. Corbier's opening summary judgment brief acknowledges *Tanner*'s holding but argues that "*Tanner* is inconsistent with the direction of the Supreme Court in *Filarsky v. Delia*, 566 U.S. 377, 389 (2012), that 'immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis.'" Doc. 187 at 33 (quoting *Filarsky*, 566 U.S. at 389).  But, as plaintiffs correctly argue in response, *Tanner* explicitly addressed *Filarsky*, distinguishing the facts of that case and holding that *Filarsky* was "inapplicable" to medical professionals employed by a government contractor who work "largely free" of government supervision.  *Id.* at 871.  Thus, plaintiffs argue, the qualified immunity defense doesn't apply here where Dr. Corbier was employed by a private entity that contracted with the State of Kansas.

Dr. Corbier's Reply takes a different approach.  He pulls language from *Tanner*'s conclusion that recites the qualified immunity defense doesn't apply to "private medical professionals employed full-time by a multi-state, for-profit corporation systematically organized to provide medical care in correctional facilities."  *Id.* at 874.  And then, Dr. Corbier argues that he wasn't employed by Corizon, but instead, was employed by Correctional Healthcare Associates of Kansas—a Kansas professional association that independently contracted with Corizon.  Doc. 227 at 106.  So, Dr. Corbier argues, he "was not employed by a 'multi-state, for profit corporation[']" and "*Tanner* is inapposite."  *Id.* (quoting *Tanner*, 989 F.3d at 874).

There are several problems with Dr. Corbier's argument. *First*, Dr. Corbier first raises this argument about his employment in his Reply brief. The court generally doesn't consider arguments raised for the first time in a Reply. *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (holding that an argument raised for the first time in a reply brief is waived (citation omitted)); *see also Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-1094-JTM-TJJ, 2018 WL 489100, at *1 (D. Kan. Jan. 19, 2018) ("[T]he Court will not consider arguments raised for the first time in a reply brief, particularly where the arguments could have been made in the first instance."). So, the court could reject Dr. Corbier's argument for this reason alone—*i.e.*, by holding that he waived the argument by failing to raise it in his opening brief. But, there are two more reasons why his argument fails to carry the day.

*Second*, his assertions about his employment aren't supported by the summary judgment record. Dr. Corbier supports his factual assertions about his employment relationship with Corizon by citing the Pretrial Order. Doc. 227 at 106 (citing Doc. 209 at 2, ¶ 2 (citing Ex. 2 to Dr. Corbier's summary judgment motion which is the Pretrial Order (Doc. 187-3))). The parties stipulated in the Pretrial Order that Dr. Corbier was employed by Correctional Healthcare Associates of Kansas and served as the Regional Medical Director for Corizon for the State of Kansas. Doc. 196 at 3 (Pretrial Order ¶ 2.a.4.); *see also* Doc. 187-3 at 3 (Pretrial Order ¶ 2.a.4.). The summary judgment record says nothing about Correctional Healthcare Associates of Kansas's independent contract with Corizon.

*Third*, even if the summary judgment record supplied the evidence Dr. Corbier cites, the court doesn't understand why that might matter. *Tanner* held that the qualified immunity defense isn't available to "private medical professionals who are employees of a contractor that provides healthcare in jails or prisons[.]" 989 F.3d at 870. Even though Dr. Corbier wasn't

directly employed by Corizon, the summary judgment record shows that he had some kind of employment relationship with Corizon—perhaps through Correctional Healthcare Associates of Kansas's contract with Corizon, as Dr. Corbier asserts but doesn't support with any summary judgment evidence.  And through Dr. Corbier's employment relationship with Corizon, he served as a "private medical professional[ ]" who "provid[ed] healthcare in jails or prisons[.]" *Id.*  Thus, *Tanner*'s holding applies to Dr. Corbier, and he isn't entitled to assert a qualified immunity defense against plaintiffs' § 1983 claims.

### d.    Conclusion

The court concludes that plaintiffs have failed to present a triable issue whether Dr. Corbier is liable for § 1983 violations in his supervisory capacity.  Thus, the court grants summary judgment against plaintiffs' § 1983 claims against Dr. Corbier premised on a supervisory liability theory.

But, none of Dr. Corbier's arguments against plaintiffs' § 1983 claims asserted against him in his individual capacity entitle him to summary judgment.  Instead, plaintiffs have come forward with admissible evidence supporting a triable issue whether Dr. Corbier was deliberately indifferent to Mr. Davis's serious medical needs sufficient to hold him liable in his individual capacity.  Thus, the court denies Dr. Corbier's summary judgment motion against the § 1983 claims asserted against Dr. Corbier in his individual capacity.

### 2.   Corizon

Next, the court considers whether summary judgment is warranted against the § 1983 claims plaintiffs assert against Corizon.  To hold a private entity liable under § 1983, a plaintiff must show that the entity had adopted an "official municipal policy of some nature," that was the direct cause or moving force behind the constitutional violations.  *Dubbs v. Head Start, Inc.*, 336

F.3d 1194, 1215–16 (10th Cir. 2003) (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) and noting that though *Monell*'s "interpretation of § 1983 . . . applied to municipal governments and not to private entities acting under color of state law," the *Monell* doctrine also "extend[s] . . . to private § 1983 defendants" (footnote, further citations, and quotation marks omitted)).  A "private actor 'cannot be held liable *solely* because it employs a tortfeasor—or, in other words . . . cannot be held liable under § 1983 on a *respondeat superior* theory.'"  *Id.* at 1216 (quoting *Monell*, 436 U.S. at 691).

Corizon's summary judgment motion asserts three arguments against plaintiffs' § 1983 claims.  The court addresses each argument, in turn, below.

### a.   Deliberate Indifference

*First*, Corizon argues that the summary judgment facts present no triable issue whether any Corizon provider was deliberately indifferent to Mr. Davis's serious medical needs.  Thus, Corizon contends, Mr. Davis fails to come forward with evidence supporting an Eighth Amendment constitutional violation of his rights.  And, § 1983 liability cannot "attach 'where there was no underlying constitutional violation by any of'" the private entity's employees.  *Ellis ex rel. Est. of Ellis v. Ogden City*, 589 F.3d 1099, 1104–05 (10th Cir. 2009) (quoting *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) and holding that the failure to allege sufficiently that officers "committed a constitutional violation" in turn, meant that plaintiff had failed to "provide the nexus required for municipal liability under § 1983"); *see also Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020) ("[A] claim under § 1983 against . . . a municipality cannot survive a determination that there has been no constitutional violation."); *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) ("It is well established . . . that a municipality cannot be held liable under section 1983 for the

64

acts of an employee if a jury finds that the municipal employee committed no constitutional violation.")

As discussed above, the court finds that the summary judgment record contains sufficient facts for a reasonable jury to find that Mr. Davis's medical providers were deliberately indifferent to his serious medical condition, thus violating his Eighth Amendment rights. So, Corizon isn't entitled to summary judgment on its first argument that it has no § 1983 liability because no medical provider denied Mr. Davis's constitutional rights.

### b.  Corizon Policies

*Second*, Corizon argues that it deserves summary judgment against plaintiffs' § 1983 claims because the summary judgment facts present no triable issue whether any Corizon policy or procedure provided the moving force behind any constitutional deprivation. The elements for supervisory liability under § 1983—as already discussed for Dr. Corbier in Part IV.A.1.b.—and "the elements for . . . municipal liability are the same" when a plaintiff alleges that a policy or custom caused the underlying constitutional violation. *Burke v. Regalado*, 935 F.3d 960, 999 (10th Cir. 2019). Both types of § 1983 liability require plaintiffs to come forward with evidence of:  (1) an "official policy or custom[,] (2) causation, and (3) state of mind." *Id.* at 998 (citation and internal quotation marks omitted).

A municipal policy or custom may take on several forms:

(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations and internal quotation marks and brackets omitted); *see also Burke*, 935 F.3d at 998–99 (explaining that a plaintiff may satisfy the "official policy or custom" element with evidence of a "a formally promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision" (citation and internal quotation marks omitted)).

Here, plaintiffs' arguments against summary judgment mirror the arguments they assert against Dr. Corbier's summary judgment motion on the § 1983 claims asserted against him in a supervisory capacity. *Compare* Doc. 209 at 100–01 *with* Doc. 210 at 107–08. Plaintiffs argue: (1) Corizon used the Nurse Encounter Tool "in an effort to make inmates receive care from nurses rather than doctors," and (2) Corizon had an "overall approach to medicine" that "was geared toward reducing costs by reducing outside care." Doc. 210 at 107.

For the same reasons already discussed, plaintiffs have failed to come forward with a triable issue whether these purported policies served as the "moving force" behind a violation of Mr. Davis's constitutional rights. Once again, plaintiffs don't explain how the Nursing Encounter Tool produced a constitutional violation. They don't explain how it prevented Mr. Davis from receiving adequate medical care—especially in light of the summary judgment record showing Mr. Davis received care not just from nurses, but also from Corizon physicians.

Also, plaintiffs' vague thematic references to policies that put profits over medical care don't suffice to establish a policy or custom violating Mr. Davis's rights. Plaintiffs' Opposition generally refers to Corizon's policies "emphasiz[ing] cost savings and profit over proper medical care." Doc. 210 at 116; *see also id.* at 107 ("Corizon adopted and implemented formal or informal policies or customs that resulted in an approach to prison medical care that discouraged necessary treatment and testing of inmates in order reduce costs and maximize profits.").

Although the court must construe the facts in plaintiffs' favor on summary judgment, plaintiffs' portrayal of the record proves too much.  When making these assertions about policies putting profits ahead of medical care, plaintiffs never cite any specific policies in the record.  Instead, plaintiffs cite, generally, to Corizon policies, arguing that they discouraged medical treatment to inmates in favor of cost-savings profits.  But, none of the specific Corizon policies that plaintiffs attach to their summary judgment motion include a custom, practice, or procedure of *denying or withholding* necessary medical treatment for the purposes of saving money.  To the contrary, the policies plaintiffs cite refer to increasing the level of on-site care and enhancing the services— *i.e.*, providing more medical care—to inmates on-site as a way to reduce unnecessary trips to the emergency room or outside providers.  *See* Doc. 210 at 59–60.[9]

And, importantly, plaintiffs offer no admissible evidence that would allow a reasonable jury to find or infer a link between any purported Corizon policy and violation of Mr. Davis's constitutional rights.  Plaintiffs' Opposition to Corizon's summary judgment motion includes five Statements of Fact that describe two cases where courts—in other parts of the country— found evidence sufficient to hold Corizon liable under § 1983 for implementing unconstitutional policies.  Doc. 210 at 80–81 (Pls.' Additional Statements of Fact ¶¶ 164–68).  But, these two cases involved different facts with different medical staff at prisons outside Kansas who had engaged in specific actions that aren't identical to the facts presented on this summary judgment motion.  These cases don't suffice to show that Corizon had adopted a policy at Hutchinson Correctional Facility that providers there knew of and followed, and that produced a violation of

---

[9]      Like Dr. Corbier, Corizon controverts plaintiffs' citation to certain Corizon policies asserting that plaintiffs haven't established the requisite foundation for them.  Doc. 226 at 7–11.  Even if plaintiffs established proper foundation, they haven't presented a triable issue on this summary judgment record that any Corizon policy caused a constitutional violation.

Mr. Davis's constitutional rights. Without sufficient summary judgment evidence creating a triable issue whether Corizon had adopted a policy that was the moving force behind the constitutional deprivation, plaintiffs' § 1983 claims against Corizon cannot survive on this theory.

### c.  Supervisory Liability

*Third*, Corizon asserts that plaintiffs cannot hold it liable under a theory of supervisory liability. As the court already has discussed, a "private actor 'cannot be held liable *solely* because it employs a tortfeasor—or, in other words . . . cannot be held liable under § 1983 on a *respondeat superior* theory.'" *Dubbs*, 336 F.3d at 1216 (quoting *Monell*, 436 U.S. at 691). Plaintiffs' Opposition doesn't challenge this argument. And, Corizon is correct that it cannot incur liability under § 1983 on a *respondeat superior* theory. Instead, plaintiffs must show that Corizon implemented a policy or procedure that produced a constitutional violation. But, as just discussed, plaintiffs haven't shouldered that burden.

In sum, the summary judgment record fails to support a triable issue of § 1983 liability against Corizon. Plaintiffs have failed to present a genuine issue whether a Corizon policy or procedure was the moving force behind a constitutional violation. And, as Corizon correctly argues, plaintiffs can't hold Corizon liable under § 1983 strictly on a theory of supervisory liability. Thus, the court grants summary judgment against plaintiffs' § 1983 claims asserted against Corizon.

### B.  Kansas Common Law Claims

The court now turns to plaintiffs' claims relying on Kansas state law. Plaintiffs assert such claims against both Dr. Corbier and Corizon. These causes of action claim wrongful death and negligence.

Both Dr. Corbier and Corizon argue they are entitled to summary judgment against the Kansas claims because plaintiffs have failed to designate expert testimony on the standard of care to support their Kansas claims. Also, Dr. Corbier argues that Kan. Stat. Ann. § 40-3403 bars liability against Dr. Corbier for damages arising out of actions committed by other health care providers. The court addresses each argument, separately, below.

### 1. Expert Testimony

The court starts by considering defendants' argument that plaintiffs have failed to adduce the requisite expert testimony to support their Kansas claims. Under Kansas law, a medical malpractice plaintiff must prove:

> (1) The health care provider owed the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the provider breached this duty or deviated from the applicable standard of care; (3) the patient was injured; and (4) the injury proximately resulted from the breach of the standard of care.

*Drouhard-Nordhus v. Rosenquist*, 345 P.3d 281, 286 (Kan. 2015).

"The plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the injury." *Hare v. Wendler*, 949 P.2d 1141, 1146 (Kan. 1997) (internal citations and quotation marks omitted). "Except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation." *Id.* (internal citations and quotation marks omitted).

Dr. Corbier argues that none of plaintiffs' experts identify a standard of care that Dr. Corbier—as a Regional Medical Director—violated, or opine that a violation of the standard of care caused Mr. Davis's damages. Corizon separately argues that plaintiffs' experts fail to

identify a standard of care for Corizon's *nursing staff* or that a violation of that nursing standard of care caused Mr. Davis's damages. But defendants' arguments read the experts' opinions far too narrowly.

Plaintiffs have come forward with expert testimony sufficient to satisfy their legal burden. The testimony of their experts, Dr. Lara Strick and Dr. Richard Berg, opine that Mr. Davis's medical providers breached the standard of care and thus provide the requisite expert testimony to support plaintiffs' wrongful death and negligence claims under Kansas law. Their opinions about Mr. Davis's medical providers—generally—include Dr. Corbier, who, as already discussed, personally participated in Mr. Davis's care by overseeing that care and considering requests for outside treatment made by other medical providers. Also, their reports include opinions about medical providers—which necessarily includes both physicians, nurses, and other Corizon staff—who, the experts opine, failed their duties to provide Mr. Davis adequate medical care.

Specifically, Dr. Strick opines that "[a]ll the signs" were present that Mr. Davis "had a serious illness involving his brain, and staff saw them, but they did not do anything about them in a timeframe that meets the standard of care and thus failed to provide life saving therapy." Doc. 209-10 at 5, 20. Relying on Mr. Davis's medical records, Dr. Strick cites various symptoms that Mr. Davis experienced but notes that "none of these symptoms, however, were addressed." *Id.* at 20. She opines that the "medical providers failed to recognize a life threatening medical condition over nine months as a result of failing to adequately examine and assess" Mr. Davis. *Id.* at 21. And, she opines, "an adequate neurologic exam would have led to the necessary testing and/or consultation to eventually lead to the proper hospital diagnostics."

*Id.*  Similarly, Dr. Berg opines that Mr. Davis "likely could have recovered" from his illness "had he been given proper antimicrobial therapy for 14 days before his cardiac arrest."  *Id.* at 24.

The Kansas Supreme Court has explained that an expert's opinion need not use "'magic' words" but, instead, using expressions like "'probably,' 'more likely than not,' and others of similar import are proper qualifications for a medical expert's opinion testimony if, taken as a whole, the testimony reflects an honest expression of professional opinion as to reasonable medical probabilities."  *Nunez v. Wilson*, 507 P.2d 329, 334 (Kan. 1973).  Here, taken as a whole, the expert opinions provide sufficient expert testimony that Mr. Davis's medical providers breached the standard of care by failing to examine and assess Mr. Davis properly and that these failures caused Mr. Davis's damages because he never received a correct diagnosis (before he died) or treatment for his condition.  The court thus declines to grant summary judgment against the Kansas claims based on defendants' argument about the sufficiency of plaintiffs' expert testimony.

### 2.  Kan. Stat. Ann. § 40-3403

Next, the court considers Dr. Corbier's argument that Kan. Stat. Ann. § 40-3403 bars liability against him for damages arising out of actions committed by other health care providers.[10]  Kan. Stat. Ann. § 40-3403(h) provides:

> A health care provider who is qualified for coverage under the [health care stabilization] fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services

---

[10]     Corizon asserts an argument based on Kan. Stat. Ann. § 40-3403(h) for the first time in its Reply. Doc. 224 at 9–10.  But, our court "generally refuse[s] to consider issues raised for the first time in a reply brief."  *Liebau v. Columbia Cas. Co.*, 176 F. Supp. 2d 1236, 1244 (D. Kan. 2001) (citations omitted); *see also Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders, LLC*, No. 16-1094-JTM-TJJ, 2018 WL 489100, at *1 (D. Kan. Jan. 19, 2018) ("[T]he Court will not consider arguments raised for the first time in a reply brief, particularly where the arguments could have been made in the first instance.").  But, even if the court considered Corizon's untimely argument, it fails for the same reasons discussed above, in response to Dr. Corbier's argument based on Kan. Stat. Ann. § 40-3403(h).

> inside or outside this state by any other health care provider who is also qualified
> for coverage under the fund.

Kan. Stat. Ann. § 40-3403(h); *see also Cady v. Schroll*, 317 P.3d 90, 100 (Kan. 2014) ("[W]e

reaffirm the holding in those cases that [Kan. Stat. Ann. §] 40-3403(h) absolves a health care

provider not just from vicarious liability but from any responsibility, including independent

liability, where the injured party's damages are derivative of and dependent upon the rendering

of or the failure to render professional services by another health care provider."); *Luttrell v.

Brannon*, No. 17-2137-JWL, 2018 WL 3032993, at *10–11 (D. Kan. June 19, 2018) (holding

that Kan. Stat. Ann. § 40-3403(h) immunizes healthcare providers from liability for plaintiff's

state law claims that "arise out of another health care provider's rendering of or failure to render

professional services").

Here, Dr. Corbier argues that Kan. Stat. Ann. § 40-3403(h) immunizes him from liability

because plaintiffs' claims arise out of alleged negligence committed by other medical providers.

The court disagrees.  As plaintiffs correctly argue, their Kansas wrongful death and survival

claims don't rely exclusively on acts by other healthcare providers.  Instead, plaintiffs assert their

Kansas claims "against Dr. Corbier based on his own negligence as a member of the medical

team that provided medical care for Mr. Davis."  Doc. 209 at 109.  And, as already discussed,

plaintiffs have come forward with summary judgment facts presenting a triable issue whether Dr.

Corbier's own actions or inactions—committed during his oversight and participation in Mr.

Davis's care—establish that Dr. Corbier failed to provide adequate medical care to Mr. Davis's

serious medical needs.  Thus, on these summary judgment facts, Kan. Stat. Ann. § 40-3403(h)

doesn't bar plaintiffs' Kansas wrongful death and survival claims.  *See Nash v. Blatchford*, 435

P.3d 562, 574–75 (Kan. Ct. App. 2019) (holding that Kan. Stat. Ann. § 40-3403 did not

immunize defendant because the case did "not involve another health care provider's potential

vicarious liability for [defendant's] alleged negligence" but, instead, plaintiff had "sued [defendant] for his acts or omissions while performing surgery or when providing [plaintiff's] care and treatment[,]" and the statute "does not prohibit a claim against one health care provider for his or her negligent acts").  For these reasons, the court declines to enter summary judgment against plaintiffs' Kansas claims based on the provisions in Kan. Stat. Ann. § 40-3403(h).

### C.  Punitive Damages

Finally, Corizon moves for summary judgment against plaintiffs' punitive damages claims, arguing that no genuine issue exists whether Corizon's conduct was evil or malicious.  Because the court concludes that Corizon is entitled to summary judgment against the § 1983 claim asserted against it, the court, in effect, already has decided the punitive damages aspect of plaintiffs' § 1983 claim.  *See Smith v. Wade*, 461 U.S. 30, 56 (1983) ("[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.").

But, because the court finds that summary judgment isn't warranted against plaintiffs' Kansas claims, it must consider whether plaintiffs are entitled to assert a punitive damages claim against Corizon under its state law theories of liability.[11]  *See* Doc. 196 at 28 (Pretrial Order ¶ 5.b.) (asserting punitive damages claim).  By Kansas statute, in "any civil action where claims for exemplary or punitive damages are included, the plaintiff shall have the burden of proving, by clear and convincing evidence in the initial phase of the trial, that the defendant acted toward

---

[11]      This Order only considers whether plaintiffs have come forward with facts sufficient to assert a punitive damages claim under Kansas law.  It doesn't consider the separate, procedural arguments that defendants assert against plaintiffs' punitive damages claim in a separate Motion to Strike, or alternatively, for Summary Judgment (Docs. 180 & 183), based on plaintiffs' alleged failure to disclose a claim for punitive damages.

the plaintiff with willful conduct, wanton conduct, fraud or malice."  Kan. Stat. Ann. § 60-3701(c); *see also D.M. by & through Morgan v. Wesley Med. Ctr., LLC*, 487 F. Supp. 3d 1071, 1078 (D. Kan. 2020) (explaining availability of punitive damages under Kansas law).

"For their acts to be wanton, defendants must [1] realize the imminence of danger and [2] recklessly disregard and be indifferent to the consequences of their act."  *D.M.*, 487 F. Supp. 3d at 1078 (citation and internal quotation marks omitted).  When evaluating the "realizing imminent danger" prong, the court "asks whether based on defendants' knowledge of existing conditions, they were aware that their action or inaction 'would likely or probably result' in the injury or other known risk or complication."  *Id.* (first quoting *Holt v. Wesley Med. Ctr., LLC*, No. 00-1318-JAR, 2004 WL 1636574, at *8 (D. Kan. July 19, 2004); then citing *Reeves v. Carlson*, 969 P.2d 252, 256–57 (Kan. 1998)).  For the "reckless disregard and indifference" prong, "Kansas law does not require plaintiff to establish 'a formal and direct intention to injure any particular person.  It is sufficient if [ ] defendant evinced that degree of indifference to the rights of others which may justly be characterized as reckless.'"  *Id.* (quoting *P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1303 (D. Kan. 2009)).  But recklessness "is more than mere negligence and requires conduct which shows 'disregard of or indifference to consequences, under circumstances involving danger to life or safety of others.'"  *Id.* (quoting *P.S. ex rel. Nelson*, 658 F. Supp. 2d at 1303).  The court "typically reserves the question of wantonness for the jury—only when reasonable persons 'could not reach differing conclusions from the same evidence may the issue [of wantonness] be decided as a question of law.'"  *Id.* (quoting *Danaher v. Wild Oats Mkts., Inc.*, 779 F. Supp. 2d 1198, 1213 (D. Kan. 2011)).

Here, plaintiffs have adduced admissible evidence presenting a triable issue whether defendants engaged in wanton conduct.  A reasonable jury could conclude that Dr. Corbier and

the other Corizon medical providers realized the imminence of danger based on the symptoms Mr. Davis was experiencing, the months-long duration of time that he was experiencing them, and the escalating severity of those symptoms in the weeks leading up to Mr. Davis's death. Also, a reasonable jury could find that defendants disregarded or acted indifferent to the consequences of their actions based on their failure to provide Mr. Davis the necessary treatment and diagnosis before his death. As noted, Kansas "typically reserves the question of wantonness for the jury[.]" *Id.* The facts here present a jury question whether punitive damages are warranted under Kansas law. So, the court denies Corizon's summary judgment motion against plaintiffs' punitive damages claims.

## V.   Conclusion

For reasons explained, the court grants Dr. Corbier's Motion for Summary Judgment in part and denies it in part. The court grants summary judgment against plaintiffs' § 1983 claims asserted against Dr. Corbier in his supervisory capacity. But, the court denies summary judgment against plaintiffs' § 1983 claims asserted against Dr. Corbier in his individual capacity. Also, the court denies summary judgment against plaintiffs' Kansas common law claims asserted against Dr. Corbier.

And, for Corizon, the court grants its Motion for Summary Judgment in part and denies it in part. The court grants summary judgment against the § 1983 claims asserted against Corizon but denies summary judgment against the Kansas common law claims. Also, the court declines to enter summary judgment against plaintiffs' claim for punitive damages under Kansas law based on the merits of that claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Paul Corbier, M.D.'s Motion for Summary Judgment (Doc. 186) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** defendant Corizon, LLC's Motion for Summary Judgment (Doc. 200) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** plaintiffs' "Motion for Leave to File Surreply on Defendant Paul Corbier, M.D.'s Motion for Summary Judgment Concerning the Role of 'Reviewing' Physician Margaret Smith, M.D." (Doc. 230) is denied.

**IT IS SO ORDERED.**

**Dated this 8th day of April, 2022, at Kansas City, Kansas.**

<u>**s/ Daniel D. Crabtree**</u>
**Daniel D. Crabtree**
**United States District Judge**